### GATES v. UNITED STATES.

### RICE v. SAME.

Nos. 2243, 2246.

Circuit Court of Appeals, Tenth Circuit.

Aug. 27, 1941.

Rehearing Denied Oct. 10, 1941.

David. Allen, of Denver, Colo., for appellants.

Thomas J. Morrissey, U. S. Atty., and Ivor O. Wingren, Asst. U. S. Atty., both of Denver, Colo., for appellee.

Before PHILLIPS and BRATTON, Circuit Judges, and FRANKLIN E. KENNAMER, District Judge.

FRANKLIN E. KENNAMER, District Judge.

The appellants perfected separate appeals from conviction under an indictment which charged them, and others, in fifteen separate counts, with violating Section 338, Title 18, United States Code Annotated, for separate acts of sending letters through the United States mail in furtherance of a scheme to defraud, and with violating Section 77q, Title 15, United States Code An-

notated, known as the Securities Act of 1933, and for conspiring to violate the Statutes above named. Pleas of not guilty were entered separately by appellants, and they were tried to the court without a jury, a jury trial having been expressly waived.

The appellant Gates was found guilty and sentenced under counts 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 13, 15, 16 and 17, and the appellant Rice was adjudged guilty upon counts 1, 2, 4, 7, 10 and 16. Numerous assignments of errors were filed by appellants, but only ten of the assignments were relied upon in this appeal. Numerous propositions are urged for a reversal of the convictions, and, as the first proposition asserted therefor is that there was no substantial evidence before the court justifying the finding of appellants guilty, it will be necessary to briefly set forth the facts established by the evidence adduced at the trial of the case.

The indictments, with the resultant trial and conviction of appellants, revolve around the sale of stock in the International White Cement Company, warehouse receipts for barrels of cement, and feldspar. Appellant Gates organized the International White Cement Company, in October, 1933, with a capital stock, divided into $90,000 of 7% Cumulative Participating Preferred stock, each having a par value of $100 per share, and $5,000 of common capital stock, with a par value of one cent per share. All of the voting power was in the common stock, and all of the common stock was issued to appellant Gates, thus placing complete control of the company in him. The company acquired leases upon plants at San Pedro, California, which it held for a period of two months; it also had some sort of an interest, for a few days, in a plant at San Fernando; in 1933, it had 160,000 tons of unmined feldspar and some feldspar mining claims, which appellant Gates transferred to the company for all of its common capital stock, which had a stated value of $5,000. The unmined feldspar, for which the company exchanged $5,000 in stock, was set up on the books as having a value of $100,000. Although the company manufactured nothing during the years 1933, 1934 and 1935, the books showed that it paid dividends on the preferred stock for the year 1934, and the money for the payment of the dividend was donated to the company by appellant Gates. Nothing was manufactured by the company during the year 1935, but dividends were set up on the books as due upon preferred stock. During 1935, the International White Cement Company negotiated a lease with a chemical company for a part of its plant for a term of 5 years. The lease also gave permission to mine limestone from lime quarries of the lessor some 75 miles distant from the plant, at a 25¢ per ton royalty. The plant was not equipped to make cement, although some of the machinery necessary for the making of cement was in the plant. Shortly after the plant was leased, appellant Gates leased from the same lessor, a building for a warehouse, and in turn leased the building to the Lawrence Warehouse Company, a company engaged in the business of issuing bonded warehouse receipts. The lease on the building and the warehouse agreement were to aid appellant Gates in the sale of warehouse receipts. No rent was paid on the warehouse, nor was anything ever stored in the building excepting 35 or 40 tons of ground feldspar. Considerable money was spent on the plant, probably totaling $25,000, the exact amount not being in evidence. It was estimated that the cost of a plant to manufacture white cement, or any kind of cement, should be between $150,000 and $200,000. The evidence showed that during the time the plant last referred to was occupied by the company, it was not equipped to make white cement, or any cement, on a commercial basis, and that none was ever produced; that the plant was not equipped with proper grinding machines to grind the clinker, and it did not have any bins or other facilities for cooling the clinker after it came out of the kiln. A member of the faculty of the University of California, a cement expert, was employed by appellant Gates to test materials for the manufacture of cement, and raw materials were delivered to the laboratory, under an arrangement that his name was not to be used for publicity or promotion purposes. Laboratory tests resulted in a report that the materials were satisfactory for making white cement, and the college professor was thereafter notified by appellant Gates that he had a complete cement plant, and that operations were ready to begin. An employee of the professor was engaged to supervise starting operations. The professor and his assistant visited the plant, and testified that it was not fully equipped, and that the plant was not capable of manufacturing white cement, or any cement, commercially, and the professor's assistant was withdrawn from the plant.

During the time that appellant Gates was engaged in and about the so-called plant, he was disposing of stock in the International White Cement Company, warehouse receipts for cement that was not manufactured, and feldspar which he agreed to buy back from the purchaser. He represented that the plant was a going concern, manufacturing cement; that there was cement in the warehouse, and that the company had a great demand for feldspar, and in this manner he obtained at least $120,000. The evidence discloses that he approached former stockholders in his failed Gates Chemical Company, and gave them common stock in his asserted going concern, the International White Cement Company, for stock in the failed company, the Gates Chemical Company. In exchanging the stock, he displayed his pictures, samples, formulas and other selling devices, and sold preferred stock to such persons. He represented that the plant was operating and manufacturing cement, and that it was necessary to enlarge the plant; that the company had always paid dividends and that it had never failed in its dividends. The record is replete with evidence of the sale of the preferred stock of the company, under representations which are shown to have been false, wherein elderly women, aged men, spinster school teachers, and even a pastor in a foreign language church, were relieved of their money, valuable stocks in other going concerns, homes, lands, and anything of value which they possessed, and were given therefor preferred stock in the International White Cement Company, under representations and promises which appellants knew to be false and untrue. One witness presented was so deaf that she had to have two hearing aids, one on each ear, during the trial of the case; another witness was so infirm that she attended court in a wheel chair; another woman was well into her eighties; all of whom were sold stock in the company, as were a vast number of others. The record fully establishes that the International White Cement Company was not engaged in the manufacture, commercially, of white cement; that it had not sold any cement, and had no white cement, or cement of any sort, stored in a warehouse against which receipts could have been issued, but that during such time representations were made that it was engaged in manufacturing and selling white cement, and that it had cement stored in a warehouse, and preferred stock of the corporation was sold in said corporation, under misrepresentations of fact.

The first proposition relied upon for a reversal is that the evidence does not, as a matter of law, support the judgment of conviction. It was freely admitted that the United States mails were used and employed by appellants, and that letters, stock certificates and dividend checks were sent through the mails. It is insisted, however, that the appellants believed the statements made by them in the sale of the stock, and that they had no scheme to defraud; that if false statements were sent through the mails they were not knowingly and wilfully made, as appellants were in good faith. In other words, it is contended that there was no fraudulent intent, and for that reason no crime had been committed. This contention is without merit. The trial judge was the trier of the facts, and the evidence in behalf of the government was more than sufficient to establish the guilt of the defendants. The conduct of the defendants, together with the actual facts, are convincing that false and untrue statements were made to induce persons to buy preferred stock in the company. Such fraud and evasion of punishment cannot be dispensed with by the mere statement of appellants that they believed the representations they made, and that they, in good faith, intended to manufacture and sell white cement, and to afford the investors sound investments and the returns upon them. In the first place, fraudulent intent, as a mental element of crime, is often difficult to prove by direct evidence. In many cases it must be inferred from acts of the parties, and inferences may arise from a combination of acts, even though each act or instance, standing by itself, may seem unimportant. Aiken v. United States, 4 Cir., 108 F.2d 182. It is no defense to a wrongful act, knowingly and intentionally committed, that it was done with an innocent intent. Judge Sanborn, in United States v. Allis, C.C., 73 F. 165, at page 171, has aptly stated that "The intent with which an act is done is often more clearly and conclusively shown by the act itself than by any words or explanations of the act or," and he illustrates by the following: "Thus, if you found a stranger leading your horse, saddled and bridled, from your barn, in the night, without your permission, and he should explain to you that he did not intend to steal him, but was simply leading him out for exercise, you would undoubted-

ly infer his intent from his act rather than from his words." We, therefore, conclude that the trier of the facts in the instant case had sufficient evidence before him from which to infer the intent to defraud, as well as the scheme devised therefor, and to hold otherwise would in effect nullify the provisions of the Penal Code, and would permit the continued sale of worthless securities under false representations, with impunity.

■■■ It is urged that the court erred in not dismissing the indictment. This assignment is predicated upon a motion filed in the case to require the Government to return certain records to appellant that had been taken by an investigator for the Securities & Exchange Commission. The record indicates that the International White Cement Company had no office where it kept its records after 1935, and that appellant Gates had left records of the corporation with an attorney in Reno, Nevada, and the records, in two bundles, were placed in the Railway Express Agency, for express delivery to the wife of appellant Gates at Las Vegas, Nevada, with a notation that she would call for them. No call was made and the records were not delivered, but remained in the express office, and thereafter an investigator for the Securities & Exchange Commission, who was charged with investigating the case, served a Securities & Exchange Commission subpoena duces tecum on the Railway Express Agency, resulting in the delivery of such records to the investigator, who brought them to Denver, and Mrs. Gates was notified thereof. Four overt acts were based upon records obtained in this manner. The motion for the return of the records was confessed by the Government and all of the papers were returned to appellants, and none of such records were used at the trial. All of the overt acts were dropped and no trial was had thereon. None of the papers were before the grand jury, excepting four letters, which constituted the basis for four overt acts in the indictment, which were dropped. It is not contended that the letters and evidence upon which appellants were tried under the other counts of the indictment were among the records so obtained by the investigator for the Securities & Exchange Commission. The fact that some of the evidence before the grand jury was incompetent does not nullify or vitiate the entire indictment. The test must necessarily be whether there was any competent evidence on which the indictment might be based, and there is nothing in the record which shows that competent evidence was not before the grand jury when it returned the indictment, except as to the four overt acts. See Murdick v. United States, 8 Cir., 15 F.2d 965. No error was committed in refusing to dismiss the indictment.

■■■ Complaint is made for failure of the court to grant appellants a bill of particulars. It is contended that it was impossible for appellants to organize any defense to the indictment, because of the impossibility of anticipating what witnesses would confront them; that the list of witnesses was voluminous and that the defendants could not know which of the persons were going to confront them at the trial as persons whom appellant Gates allegedly defrauded. The indictment was long and clearly set forth the charges. Complete information as to the alleged crime was contained therein, and appellants clearly could ascertain from it the nature of the complaint and the charges they were required to defend against. They were not entitled to be told the names of the witnesses who would appear at the trial, as they had a list of the witnesses capable of being used. The trial court did not abuse his discretion in denying the motion for the bill of particulars. The granting or denying of a bill of particulars is in the sound discretion of the court. Parnell v. United States, 10 Cir., 64 F.2d 324; Hood v. United States, 10 Cir., 76 F.2d 275; Hood v. United States, 10 Cir., 78 F.2d 150, and United States v. Parker, D.C., 19 F.Supp. 450, 463.

■■■ It is contended that error was committed by the denial of the motion to quash the indictment submitted by appellants. It was insisted that the indictment was so inconsistent and repugnant that it precluded the appellants from knowing what they were charged with. It is asserted that the inconsistencies and repugnancies consisted of allegations of representations that the plant was fully equipped with machinery with which to manufacture white cement, allegations that it was fully equipped with machinery and operating and engaged in the business of manufacturing white cement, followed by allegations that persons were told that the money was being used for the purpose of equipping and developing the plant and quarries of the company. The indictment charges that these representations were made to various per-

sons in order to induce them to purchase stock, cement or feldspar; it is not charged that all of the representations were made to the same person. We do not see any contradiction in the allegations of the indictment, which is the basis for repugnancy. No error was, therefore, committed in denying the motion to quash.

An assignment of error is based on a denial of the application for a change of venue from the District of Colorado to the District of Nevada. It is urged that Article VI of the amendments to the Constitution of the United States confers upon a defendant the absolute right to a trial in the District wherein the crime shall have been committed. The soundness of this proposition cannot be questioned. The evidence clearly established that the crime charged in the indictment was committed in the District of Colorado, where appellants were tried. It seems to be the contention of appellants that they desired a change of venue from the District of Colorado to the District of Nevada, because they were unable to bring their witnesses to Colorado, and that the majority of such witnesses resided in and around Nevada, and the International White Cement Company was incorporated under the laws of the State of Nevada. The constitutional amendment referred to does not provide for a change of venue for the convenience of persons charged with crime; neither does it provide for a trial at a point or place of residence of the majority of witnesses. Changes of venue within a district are proper for the convenience of witnesses where the charge is laid in the district wherein the alleged crime was committed. The crime in the instant case was, causing to be delivered by mail, in the State and District of Colorado, certain letters in furtherance of a scheme to defraud, and the gist of the offense is the use of the mails in execution of such a scheme to defraud. Mathews v. United States, 8 Cir., 15 F.2d 139. The crime in the instant case was committed where the mail was used. United States v. Young, 232 U.S. 155, 34 S.Ct. 303, 58 L.Ed. 548.

It is contended that there was error in the refusal by the trial court to exclude witnesses from the court room when appellants moved for such a separation of the witnesses. The separation of witnesses, and their exclusion from the court room during the trial, rests solely in the sound discretion of the trial court. Reger v. United States, 10 Cir., 46 F.2d 38. It is generally appropriate and commendable in the interest of preventing collusive testimony, to exclude witnesses from the court room while other witnesses are testifying, but the application of the rule, as noted above, is addressed to the sound discretion of the trial court. In the instant case, many of the witnesses were old and decrepit, and hardships would undoubtedly have resulted in moving the witnesses about. Judges of long experience are most generally capable of passing upon the credibility of witnesses and can, under ordinary circumstances, discern collusive testimony. There is no showing that there was any collusive testimony in the instant case, or that appellants were prejudiced in any manner by refusal of the trial court to grant their motion to exclude witnesses. As there was no abuse of discretion, no error was thereby committed.

The next contention relied upon for a reversal is that appellants were denied the right to show the bias, prejudice and interest of a government witness. Appellants sought to introduce letters tending to show that a government witness intended to organize a company to make white cement and that he was probably prejudiced against appellants in order to remove them from the field of such an operation. The fact that the witness intended to organize such a company would not necessarily establish any bias or prejudice, and as there was an abundance of evidence touching upon the points testified by the particular witness, no error resulted by the refusal of the trial court to permit the cross-examination about which complaint is made.

Complaint is made that appellants were denied the right to introduce any evidence and to read to the court certain reports and documents tending to show good faith and lack of fraudulent intent. They were excluded from evidence for the reason that they were hearsay. However, appellants testified to the contents of many of the documents, in order to show that they believed such reports and acted and relied thereon. No offer of proof was made as to any of the documents but they were assigned as errors. Even if they had been admitted, though incompetent, they would not justify a reversal of a case, because the trier of the facts had the benefit of their contents from the oral testi-

mony of appellants and considered and weighed the same in reaching the conclusions of guilt.

It is urged that appellants were denied a fair and impartial trial by reason of remarks of the court, and of the assistant United States Attorney. There is no merit whatever to this contention. Briefly, it is, that during the testimony of a government witness wherein he had related the trading of stock in a going concern for preferred stock in the International White Cement Company, and the trial judge inquired of him as to who got the best of the deal, the witness replied that he thought Mr. Gates did, inasmuch as the other stock was worth something. The case was tried without a jury, and even if a jury had been present, we can see no indication of prejudice, or any indication of impartiality from such remarks.

Complaint is made of a question of the assistant District Attorney directed at appellant Gates, when he was asked if he had not taken the last thing from one of the government witnesses. The record reveals that the particular lady had invested $8,500 in failed companies of appellant Gates, before he organized the International White Cement Company, and that he sold her one share of preferred stock in the company, permitting her to pay for it at $2.50 per month; that he subsequently secured from her ten shares of a stock worth $1,000, and later obtained from her a $100 bond; that the only remaining asset she had was $500 worth of mining stock which he took from her, and gave her a warehouse receipt for 43 barrels of cement. We fail to see that any prejudice resulted from the question of the prosecutor. It may not have been a proper question, but we cannot say that the conduct of appellant could not normally provoke such a question under the circumstances related. Where a case is tried to the court without a jury, it is assumed that the court considered only competent and material evidence, and disregarded incompetent, immaterial and improper evidence. United States v. David, 7 Cir., 107 F.2d 519; Murray v. United States, 8 Cir., 117 F.2d 40, and Hoffman v. United States, 9 Cir., 87 F.2d 410.

The final contention urged is that appellants were denied the right in the trial of the cause to witnesses in their behalves, in violation of their constitutional rights. An order was entered, after commencement of the trial, granting appellant the right to procure witnesses as a poor person. Over thirty subpoenaes were issued to marshals in various parts of the United States. When it was drawn to the attention of the government's attorney that appellants were subpoenaing witnesses from outside the District of Colorado at the expense of the government, and that the marshal for the District of Colorado was without authority to pay the expenses of such witnesses outside of his District, or for more than 100 miles from the place of trial, an order was entered in open court limiting the rights of appellants to proceed with the trial as a poor person, and to subpoena witnesses at the expense of the government. The order imposed the burden upon the marshal to pay fees and mileage after the witnesses entered the District of Colorado. It is contended that appellants did not have the funds, neither could they raise the money, with which to pay the expenses of witnesses to attend the trial and that appellants were forced to trial without witnesses in their behalf. The Federal Code provides that: "Whenever any person indicted in a court of the United States makes affidavit, setting forth that there are witnesses whose evidence is material to his defense; that he can not safely go to trial without them; what he expects to prove by each of them; that they are within the district in which the court is held, or within one hundred miles of the place of trial; and that he is not possessed of sufficient means, and is actually unable to pay the fees of such witnesses, the court in term, or any judge thereof in vacation, may order that such witnesses be subpœnaed if found within the limits aforesaid. In such case the costs incurred by the process and the fees of the witnesses shall be paid in the same manner that similar costs and fees are paid in case of witnesses subpœnaed in behalf of the United States." 28 U.S.C.A. § 656.

There was no authority for the payment of fees or mileage for witnesses outside the District of Colorado, or beyond 100 miles of the place of trial. The trial court was without authority to permit appellants to bring witnesses from distances greater than those specified in the Statute. It is noteworthy that the trial of the case began on November 22, 1940, and that appellants did not attempt to subpœna witnesses until November 23, 1940, and after the trial of the case had commenced. This alone is probably justification for a de-

nial of any aid at the expense of the government for producing the witnesses, as the right to summon witnesses at the expense of the government is addressed to the sound discretion of the trial court, and the exercise of that discretion is not reviewable. Goldsby v. United States, 160 U.S. 70, 16 S.Ct. 216, 40 L.Ed. 343. Litigants are charged with the responsibility of acting timely even in the matter of obtaining witnesses; no legal rights of appellants have been invaded; the trial court granted them every right authorized by the Statute.

On behalf of appellant Rice, it is contended that he did not sell any stock, and that the majority of the government witnesses did not even know him. The record shows that he was an officer of the company; that he knew the representations made by his co-defendants were false, and that he did everything, in the capacity in which he was functioning, to further each of the sales. He joined the enterprise, and was a part of the scheme. It was not necessary that he participate to the same extent as each of the other defendants. The evidence in behalf of the government was more than sufficient to establish the guilt of appellant Rice upon each of the counts upon which he was convicted.

An examination of the entire record in this case shows that it is free from prejudicial error. The rights of appellants were safe-guarded at the trial, and they were accorded a fair and impartial trial.

The judgments in both cases are affirmed.