## HAWLEY v. UNITED STATES.
### No. 2513.

Circuit Court of Appeals, Tenth Circuit.

Feb. 3, 1943.

Harry S. Silverstein, of Denver, Colo. (Harry S. Silverstein, Jr., of Denver, Colo., on the brief), for appellant.

Ivor O. Wingren, Asst. U. S. Atty., for District of Colorado, of Denver, Colo. (Thomas J. Morrissey, U. S. Atty., for District of Colorado, of Denver, Colo., on the brief), for appellee.

Before BRATTON, HUXMAN and MURRAH, Circuit Judges.

MURRAH, Circuit Judge.

The appellant, George A. Hawley, appeals from a conviction and sentence on counts one, two, three and five of an indictment containing six counts, the first five of which charge Amos Downs, J. Boyd Henri, and appellant with having devised or intending to devise a scheme and artifice to defraud or for obtaining money and property by means of false and fraudulent pretenses, representations and promises, from numerous persons named in the indictment as persons to be defrauded, and with having used the United States mails in execution thereof in violation of Section 215 of the Criminal Code, 18 U.S.C.A. § 338. The sixth count in the indictment charges the appellant and his codefendants with having formed an unlawful conspiracy to violate 18 U.S.C.A. § 338. The appellant was acquitted on the fourth and sixth counts of the indictment, and his codefendants have not appealed from a conviction and sentence on various counts.

The dominant purpose and object of the alleged scheme was the sale of mining stock to those to be defrauded, by means of false and fraudulent representations and promises concerning the value of the stock, and the use of the mails in execution of the said scheme. To that end, it is alleged that in July, 1935, one Amos Downs caused to be organized the Humboldt Consolidated Mining Company under the laws of Colorado, for the purpose of engaging in the general mining and milling business, with an authorized capitalization of $1,250,000 consisting of five million shares of common stock with a par value of 25¢ per share. At that time, Downs owned or controlled Downs & Company, a corporation engaged in the business of selling stock, both as principal and broker; that Downs also owned and controlled the United Mines Finance Corporation, organized for the purpose of financing individuals and corporations engaged in mining operations. Subsequent to August 1936, J. Boyd Henri was engaged in the business of selling stock as principal and broker. Downs became a director and treasurer of the Humboldt Company and the appellant, Hawley, first became assistant secretary and office manager, later secretary, and from August 25, 1937, to November 22, 1937, president of the Humboldt Company. In this manner, it is alleged the parties named as defendants, with others, controlled, managed, and operated all of the companies named for the dominant purpose of selling the common stock of the Humboldt Company to the persons named in the indictment to be defrauded.

For the purpose of providing the Humboldt Company with corporate property to carry on its intended functions, Amos Downs, individually and under the name of the United Mines Finance Corporation, with the aid of one Wm. A. Lamb, acquired six specified groups of gold mining claims in the vicinity of Idaho Springs, Colorado. They transferred these claims to the Humboldt Company in consideration of 500,000 shares of common stock of the Humboldt Company, of which Downs, individually and under the name of the United Mines Finance Corporation, was assigned 460,000 shares, the remaining 40,000 of which were assigned to Lamb. As a part of the said scheme, and to induce the parties to be defrauded to purchase the common stock of the Humboldt Company owned by Downs or Downs & Company, the said Downs commenced a stock selling campaign on December 2, 1935, by addressing a letter to the parties to be defrauded in which, it is alleged substantially in the language of the letters so addressed and mailed to the parties, that the Humboldt Company owned

six groups of mining properties, comprising ninety lode mining claims, with mill sites, bringing the grand total to almost one hundred, in one of which (the Lord Byron Group), plenty of rich ore was available for immediate production. The indictment further alleges that as of January 7, 1936, Downs & Company represented to the parties to be defrauded that the Humboldt Company had acquired a new $100,000 mill, ready to grind ore, which had during the previous year been in operation as a custom mill; that the Humboldt Company now had the mines, the ore, and the mill, and consequently would begin to receive smelter checks and make profits.

According to the indictment, from time to time, and through November, 1937, by means of circular letters and other correspondence addressed to the persons to be defrauded, the defendants continued to represent that the properties owned by the Humboldt Company and in operation contained large bodies of rich ore of high gold content which was being rapidly developed, mined and shipped to the smelter; that the company was on the verge of making enormous profits and about ready to pay large dividends. It was further represented that the mill owned by the company was a highly profitable enterprise, engaged in grinding ore produced from mines owned by the Humboldt Company and several other mines in this vicinity, when in truth and in fact the parties knew that no great bodies of ore had been discovered or exposed; that the entire enterprise was operating at a deficit, and that such fraudulent representations were made solely for the purpose of inducing those to be defrauded to purchase the common stock of the Humboldt Company. Each of the first five counts in the indictment, after incorporating the scheme to defraud by reference to the first count, alleged a separate use of the United States mails in the execution of the said scheme.

In brief resume, the evidence in support of the allegations reveals the following facts. Amos Downs was a stock broker living in Denver, Colorado, who had previously financed other mining ventures in Colorado. He was a member of the Denver and Salt Lake City stock exchanges, and of the New York mining exchange. He owned or controlled Downs & Company, a brokerage firm located in Denver, Colorado, and owned and controlled the United Mines Finance Corporation which was used for the purpose of financing mining properties. Prior to the dates alleged in the indictment, Downs and others named in the indictment conceived the plan of acquiring a number of mining claims, which had already been wholly or partially developed and abandoned. They purposed to consolidate the claims by transferring them to a company which they organized as the Humboldt Consolidated Mining Company, the stock of which was to be sold to a preferred customer list which Downs owned, and apparently to whom he had previously sold stock in other mining ventures. Accordingly on or about July 22, 1935, the Humboldt Company was organized as alleged in the indictment. Upon its organization, one Ben Wright became the president. He had for a number of years past worked as a carpenter or millwright in the vicinity of these mining claims, and at the time he became president, was receiving $7 per day, which he continued to receive as president of the company. Downs became director, vice-president and treasurer. Culver was secretary and the appellant, Hawley, became assistant secretary. Immediately thereafter, Downs transferred all of the mining claims he had acquired to the company, accepting therefor 500,000 shares of common stock of the Humboldt Company, 400,000 of which he retained for Downs & Company, 60,000 to the United Mines Finance Corporation, and 40,000 shares to Lamb who had assisted in the acquisition of the mining claims. Application for a permit to sell stock was made to and granted by the Securities Exchange Commission, based upon a prospectus which showed, among other things, that Downs had personally subscribed and paid for an additional 100,000 shares of the common stock of the company, in consideration of $25,000 in cash. The facts reveal that Downs obtained a major portion of the $25,000 from eight or nine other persons who had been associated with him in other mining ventures, and the stock was later distributed to these persons in proportion to their investment.

Soon after the organization of the company, and some preliminary work in the mines, it entered upon what was described in the literature as a large and ambitious program. According to the plan, Downs & Company was to sell the stock to net the company sixty-six and two-thirds percent of its par value. Downs possessed

a list of approximately twenty-five hundred prospective investors, called the preferred list, and several thousand names and addresses of other prospective investors. On or about December 2, 1935, Downs & Company wrote the first letter to the prospective investors or stockholders, in which it was represented that the Humboldt Company was now ready to begin actual production; that plenty of ore was available for immediate mining, with assayed values of $88 to $99 per ton, which would soon be moving to the mill. A glowing picture was painted of the Humboldt Company against a background of many other highly profitable mining ventures in this vicinity. The stock of the Humboldt Company at 25¢ per share was represented as a "rare opportunity for large speculative profits" which "may not come to you again". A large illustrated circular and prospectus was enclosed which included actual photographs of mining shafts and tunnels, together with an artist's drawing of the mining claims in question, depicting in multicolors the geographical, topographical and geological locations and formations of the claims, particularly in relationship and proximity to other highly productive mining enterprises, which had long since been depleted and abandoned. On or about January 7, 1936, Downs & Company addressed another circular letter to the prospective investors and stockholders in which it announced as a "flash" Humboldt's big $100,000 mill deal, in which the mill was represented as a great and important acquisition by the company, and in which it was stated, among other things, "Humboldt already had the mines—Humboldt had the ore—now Humboldt has the mill, that completes the cycle. From now on it is simply a matter of mining, milling, and marketing. * * * Judge the future by the past and tell me how quickly you think this splendid company will begin to receive smelter checks, make profits, pay dividends". In language obviously designed to incite and arouse the gambling instincts of the readers, the letter continued to paint a romantic and alluring picture of great profits and dividends to be derived from Humboldt Company stock.

The facts reveal that the so-called $100,000 mill deal was effected by an agreement to purchase a custom mill which had already been in operation in that vicinity, and for which the company agreed to pay $50,000 in cash and 160,000 shares of its stock. $5,000 was paid at the time of the transaction and the balance was to be paid in stipulated installments. Soon after January 1936, Downs & Company became involved in difficulties not material here, which necessitated a rearrangement of the plans. J. Boyd Henri, as Henri & Company, succeeded Downs & Company in the stock selling undertaking. The Humboldt Company changed its address from the office of Downs & Company to the vicinity of the mines in Idaho Springs, and beginning March 1, 1936, the company undertook the responsibility of selling its stock to the prospective stockholders and investors. The appellant, Hawley, who had since July 22, 1935, been employed as office manager and assistant secretary, became the copy writer for the stock selling campaign. Under the new arrangements, the Humboldt Company acquired the list of prospective investors and stockholders from Downs, agreeing to remit to Downs & Company ten percent of the stock sold to the customer list. Henri & Company undertook to carry out the obligations of Downs & Company to deliver the stock heretofore sold on the credit investment plan by Downs & Company, and to continue the sale of the stock. The Humboldt Company continued its stock selling campaign, apparently in competition with Henri and others. In respect to the activities of the Humboldt Company, Hawley continued to write the copy for the circular letters and other advertising matter, which was prepared by him, submitted to the board of directors, and mailed to the prospective investors over the signature of Ben Wright, and his own.

From March 1, 1936, until September, 1937, the stock selling campaign continued unabated. The circular letters and "reports," admittedly prepared by the appellant and mailed to the prospective investors and stockholders, did not vary in their tenor and context from the original letters. In the same glowing verbose language, the prospective investors were advised at regular intervals of the phenomenal progress of the company and of the enormous profits in immediate prospect. Particularly on September 16, 1936, the investors were told that two gold mines were then producing and shipping ore, "with our mill going full swing—with high-grade being shipped direct to the smelter—with car-load after car-load of concentrates moving to the smelter—with substantial chunks of pure gold being recovered in the 'carpet'—and with smelter

checks coming in to build up a future dividend fund for the benefit of our Humboldt stockholders—with all of this now going on I believe you will agree that Humboldt shares at only 30¢ each look like a real bargain". Again on April 17, 1937, the stockholders were advised by secretary Hawley that based upon highly favorable reports for the first quarter of 1937, the board of directors had resolved to offer at 37½¢ per share, stock limited to immediate requirements for operating capital. "We have already taken out thousands of dollars of excellent ore, but if you examine the map you will see that we have barely 'scratched the surface' so to speak. Personally, am very glad our Board has acted to limit stock sales. We have only about 27% of our stock outstanding. * * * I believe the Humboldt stock is worth double the present price of 37½¢ a share and further developments should make them worth many times the present price. * * * Be bold, borrow and buy. * * * I think this really is a rare opportunity for you to invest in a good company and make some money."

During the time in which these representations were so freely made by the appellant, the company was in dire financial straits. The company was compelled to seek advances from the smelter for ore shipped, and to borrow money from its officers with which to make pay rolls. At one time, the appellant loaned the company $3,000 in cash, for which he took 75,000 shares of stock for collateral and which he sold in order to make payment of the loan. The appellant testified that he obtained the information for the representations made in the literature from the prospectus which was submitted to and approved by the Securities Exchange Commission, and from reports of reputable engineers and geological publications; that he made the representations in good faith and with the honest belief that they were true, and he now says that a reading of the letters referred to in the indictment, and introduced in evidence, will demonstrate that they, while hopeful and optimistic, were nevertheless a fair, frank and truthful presentation of actual facts and conditions as they existed as of the dates the letters were written and mailed. He says that compared with other oil and mining promotions, the representations made were conservative.

 It is true that the representations so made and alleged to be false and fraudulent were based upon certain facts. The company did own mining claims which contained some ore capable of commercial production, but the mining claims from which the ore was produced by the Humboldt Company had been previously exploited and apparently abandoned—in any event work therein had ceased. The company did produce ore and it owned a mill which it operated, but never at a profit. There was never at any time any prospects for enormous profits justifying the flamboyant statements that the company offered "the greatest opportunity for large speculative profits", or that great bodies of valuable ore were exposed and available for mining and marketing. It may be conceded that the appellant was deluded by his own imagination, but self-delusion does not justify an otherwise baseless representation to others. Baker v. United States, 8 Cir., 115 F.2d 533, 539; Stunz v. United States, 8 Cir., 27 F.2d 575, 579; Moore v. United States, 7 Cir., 2 F.2d 839, 842. If this were so, the public could not be protected by the legislative command that mails of the United States shall not be used for the purpose of executing a scheme or artifice to defraud others. It may also be admitted that the evidence is susceptible of a good faith and honest belief on the part of the appellant and his codefendants, and that they earnestly and sincerely believed the truth of the representations made, and on which the government relies to support its contentions that such representations constituted a scheme or artifice to defraud. If the dominant purpose and object of the enterprise was to engage in gold mining operations, and the sale of the stock was purely subordinate to that end, such purposes lend themselves to legitimacy and tend to deny fraudulent intent. But the questions of good faith, honest belief, intentions and purposes are, under these facts, questions which are properly within the province of a jury to decide under competent instructions from the court concerning the legal standards by which guilt or innocence must be judged. Durland v. United States, 161 U.S. 306, 16 S.Ct. 508, 40 L.Ed. 709; Moffatt v. United States, 8 Cir., 232 F. 522, 535; Moore v. United States, 7 Cir., 2 F. 2d 839, certiorari denied 267 U.S. 599, 45 S.Ct. 354, 69 L.Ed. 807; Pandolfo v. United States, 7 Cir., 286 F. 8; Gates v. United States, 10 Cir., 122 F.2d 571; Nassan v. United States, 4 Cir., 126 F.2d 613;

Bradford v. United States, 5 Cir., 129 F. 2d 274.

But the appellant complains that the court did not properly submit these issues to the jury, specifically the appellant urges us to notice that part of the instructions of the court purporting to describe the offenses charged in the indictment, contending that the court failed to define the offenses laid in the indictment with sufficient definiteness to enable the jury to understand the nature of the charge against the defendants, or to define the essential ingredients of the offenses charged in the various counts of the indictment. It is also urged that the theory of the defendants was not defined and presented by the court to the jury as a converse of the government's theory, as a consequence of which the appellant was denied a fair and impartial presentation of his defense to the jury.

Upon the points alleged as error, the court instructed the jury that the charges against the defendants were set forth in the indictment, but the indictment was only a statement of the charges and in no sense constituted evidence in the case. The jury was further instructed that each defendant was charged with a separate crime in each count of the indictment, and each defendant was entitled to separate consideration on each count; that such consideration must be separate and apart from the other defendants. The court stated the offenses in the language of the statute, and defined the charge under it in the following pertinent language. " * * * The theory of the government in this case is, gentlemen, and what they have attempted to prove is that the defendant Mr. Downs dominated and controlled the Humboldt company, and that he controlled Downs & Company and this United Mines Finance Corporation; that Mr. Henri was the sole proprietor of Henri & Company; that the defendant Hawley at one time dominated the Humboldt company because he was the President of it, and at all times mentioned in the indictment Hawley occupied some office in the company from assistant secretary clear through to that of the president. Then the government charges, and their evidence tends to prove, that having control of these companies for the purpose, as charged on page eleven of the indictment, of defrauding the persons to be defrauded, the scheme was to sell them 460,000 shares of the common stock of the Humboldt Consolidated Mining Company obtained by Downs and the United Mines Finance Corporation, and for the purpose of selling this stock and for the purpose of letting Henri and the others make a commission and a profit on the sale of this stock, some of which was Downs' and the United Mines Company, and for the purpose of letting Hawley sell the stock he was getting from the company, the defendants made these alleged misrepresentations and promises set forth in the indictment. * * * The government charges, gentlemen, and their evidence tends to prove that this was not a plan for legitimate mining, but was a scheme, the principal part of which was to dispose of the promotion stock acquired by the defendant Downs and his United Mines Finance Company, and that the selling of this stock would be and was to be accomplished by a campaign of false representations made by means of letters sent through the United States mails. In other words, they were to make their profit by this scheme, by selling their own stock, and not by drawing salaries or in padding the pay rolls, as has been stated. * * * Mr. Hawley was the copy writer and prepared the letters and reports, and saw that they were mailed. * * * Mr. Hawley not only got a salary from the company, but got stock, at first 100 shares weekly, and a two per cent over-riding commission on the sale of all stock of the company. Then later he got 75,000 shares of the stock as collateral for three loans which he made to the company, and which the company was unable to repay, and he sold all of that stock excepting approximately 16,000 shares, according to the government's evidence."

The court having thus defined the charges contained in the indictment, fairly and accurately we think, proceeded to outline and state the theory of the defendants in the following language. " * * * Now, gentlemen, the defendants' theory of the case, and that must receive your very earnest consideration, is that everything they said was true, and that the scheme failed because of their inability to raise sufficient money to carry out their plan for financing this company. You are instructed that before you can find the defendants or any of them guilty, you must find and believe beyond a reasonable doubt that they actually intended to defraud the purchasers of the capital stock of the companies referred to. It is not sufficient that the government establish that such

investors lost the money paid for such stock, or that representations were made by the defendants or any of them in the sale of the stock, unless you are satisfied beyond a reasonable doubt that the defendants intended that such misrepresentations should be made, and should be made for the purpose of defrauding such investors. * * * *You are further instructed that good faith and an honest purpose on the part of any defendant is an absolute defense as to this charge.* It matters not how visionary you may find the enterprise to be, or how unreasonable the prospects of success in any of the enterprises referred to in the evidence may seem to you, if the defendants actually believed in them. Promises made in good faith, whether they be glittering or attractive or not, are not criminal. If, therefore, you believe, or if you entertain a reasonable doubt upon the question that the representations made by the defendants, or any of them, and sent through the mails, although glittering, attractive, persuasive and alluring, were made in good faith, and not as a part of a deliberate plan or scheme to defraud or to obtain money by false pretenses, then it is your duty to find the defendant not guilty on every count in the indictment."

■ In the foregoing language, the jury was instructed fairly and correctly concerning the nature of the offense, the charge in the indictment, and the theory of both the government and the defendants. Elsewhere in its instructions, the court summarized the evidence, but was at pains to instruct the jury concerning the presumptions of innocence, reasonable doubt, as well as their province as triers of the facts, and the weight to be given each item of evidence. The language employed by the court was simple, plain, and understandable. In our judgment, it left no room for doubt or confusion concerning the nature of the offense, the charge, or the standards by which guilt or innocence should be judged. Martin v. United States, 10 Cir., 100 F.2d 490; Troutman v. United States, 10 Cir., 100 F.2d 628; Levine v. United States, 9 Cir., 79 F.2d 364.

Moreover, we have examined with care the ruling of the court on the admissibility of evidence and the comments of the court from time to time concerning its admissibility, and the purpose for which it was admitted. The trial of the case was long and tedious. It is too much to expect that in all matters reflected upon a record, the conduct of the court should be beyond all technical cause for complaint. But we are convinced from the whole record that no reversible error was committed. The appellant was connected with the enterprise which the jury has found to be fraudulent from its inception, until November, 1937. From the nature of his activities, it is difficult to segregate him from the whole scheme. Under the instructions of the court, his guilt or innocence was judged solely by the part he played, and he cannot now complain of its verdict.

One further point merits separate treatment. It is contended that the court refused to permit the appellant to prove his character or reputation for honesty, and in this manner the court erred in placing the burden of proof of good character on the appellant. The appellant offered evidence of his good reputation. The question was asked of a character witness, "What was his reputation for truth and veracity, good or bad?" Answer, "His reputation was good." The court refused to permit further questions concerning his reputation for honesty. It would seem that evidence of a good reputation necessarily implies all of the concepts which we attribute to an honest man. The court instructed the jury that good character, if proven, is evidence in favor of the defendant for whom it was given, and is competent to augment the presumption of innocence which the law raises in behalf of the defendant, because the law assumes that one who has established by his conduct in the community in which he resides a good character as a law abiding citizen, is less liable to commit the offense charged than the one who had not by his conduct and his life established such a reputation among his fellowmen.

■ Evidence of good character or reputation of one charged with crime is always admissible. It is competent as evidence tending to generate a reasonable doubt of the guilt of the offense charged, Wigmore, 2d Ed., Vol. 1, Sec. 56, and the exclusion of such evidence is error. Edington v. United States, 164 U. S. 361, 17 S.Ct. 72, 41 L.Ed. 467; Harper v. United States, 8 Cir., 170 F. 385, 390; Searway v. United States, 8 Cir., 184 F. 716. But the evidence ought to be restricted to the trait of character which is in issue, and bear analogy and reference to the nature of the charge. Wigmore, 2d Ed., Vol. 1, Sec. 59; Harper v. United

States, supra; Warren v. United States, 8 Cir., 250 F. 89; Keady v. United States, 10 Cir., 62 F.2d 689. And if such evidence is offered and accepted, the party in whose behalf it is offered is entitled to an instruction in conformity with the purposes for which it is admissible. Sunderland v. United States, 8 Cir., 19 F.2d 202, 215; Miller v. United States, 10 Cir., 120 F.2d 968. We think the question asked and the answer given had particular reference to the nature of the charge against the appellant, and the court's instructions thereon correctly defined the purpose for which it was admitted, and for which it should be considered. Furthermore, no exceptions were taken to the refusal of the court to permit further inquiry concerning the appellant's reputation, and no proffer was made concerning the answer expected to be elicited. Wigmore, 2d Ed., Vol. 1, Sec. 20, p. 197.

We find no reversible error and the judgment is affirmed.