**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**George James GROOMS, Defendant-Appellant.**

**No. 17421.**

United States Court of Appeals,
Seventh Circuit.

Jan. 5, 1972.

As Modified March 27, 1972.

James P. Hilliard, Chicago, Ill., for defendant-appellant.

James R. Thompson, U. S. Atty., J. M. Fitzsimmons, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee; William J. Bauer, U. S. Atty., Chicago, Ill., John Peter Lulinski, Asst. U. S. Atty., of counsel, assisted by Don Greco, Northwestern University School of Law.

Before SWYGERT, Chief Judge, KILEY and PELL, Circuit Judges..

SWYGERT, Chief Judge.

On June 5, 1968 two men at gunpoint robbed the First National Bank of Grand Ridge, Illinois. Norman Bayer and Allen Figge were charged with the commission of the crime under 18 U.S.C. § 2113(d). Defendant-appellant, James Grooms, was charged under the same statute with aiding the robbery. Upon their pleas of guilty Bayer and Figge

received seven and ten year prison sentences respectively. After Grooms was found guilty by a jury, he was given a twelve year sentence. In seeking a reversal of his conviction Grooms assigns a number of alleged errors.

We deem it unnecessary to state the evidence in great detail since its sufficiency is not in question. After robbing the bank, the two robbers fled in a maroon Plymouth car. The police were called and set out in pursuit. While two of the officers were driving on a gravel road outside of Grand Ridge, they met a white Ford car traveling at a high rate of speed. A Plymouth, matching the description of the getaway car, was following the Ford. The police sought to set up a roadblock, but the Plymouth eluded them and sped away; however, they were able to stop the Ford. Figge, the driver, was arrested and the stolen money was found in the car.

About twenty-five minutes later the Plymouth approached another roadblock some distance from where it and the Ford had passed the two police officers. In an attempt to elude the roadblock, the Plymouth collided with another car and overturned. Bayer, the driver, was arrested. Later that day, Grooms presented himself to the local sheriff's office upon learning that he was wanted by the authorities. After being questioned, he was released. Two days later he was rearrested for his alleged participation in the crime.

The evidence submitted to the jury as to Grooms was conflicting. The two officers first encountering the Plymouth on the gravel road positively identified Grooms, whom they had known for a long time, as the driver of the car. Other evidence showed that Bayer was the only person in the Plymouth when it crashed at the second roadblock and that Bayer's fingerprints were the only ones found on the car. Moreover, agent Stratton of the Federal Bureau of Investigation admitted, on cross-examination, that Bayer and Figge had told him that, though they had met with Grooms before the robbery, he had not been with them that day, either before or after its commission. At the time the Ford was apprehended, an airline ticket covering a flight from Baltimore to Chicago which had been issued to Grooms' wife on April 26, 1968 was found. As to this circumstance, Grooms testified that he and his wife had been in the car prior to the date of the robbery.

After his rearrest on June 7, 1968, Grooms was questioned by agent Stratton. The agent testified that on that occasion the defendant stated he had discussed the robbery and planned it with Bayer and Figge. According to the agent, Grooms also admitted that he had gone over with Figge the planned getaway route from the bank. The agent, on cross-examination, said that at the same interview Grooms denied that he had agreed to aid in the robbery.

Grooms, testifying on his own behalf, denied that he had helped plan the robbery or assisted in its commission, although he admitted that while riding with Figge two days before the robbery, Figge had said that he was thinking of robbing the Grand Ridge bank and that they had driven over the getaway route which Figge said he proposed to take.

I

During the Government's presentation of its case, agent Stratton testified that at his interview with the defendant on June 7, he told Grooms that he had information indicating that the defendant had "gone over the get-away route" with Figge, to which Grooms responded: "Yeah, . . . but you [sic] blowing this all out of proportion." The defendant contends that, indirectly at least, the Government in this fashion got before the jury the content of statements made by codefendants, Bayer and Figge, and that the admission of such hearsay violates Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), particularly in light of defense counsel's cross-examination of the witness which he thought must be undertaken and which brought out the

fact that the information had indeed come from Bayer and Figge.

■ Defendant's contention must be rejected. During his direct examination, agent Stratton did not indicate the source of his information nor did he attribute any statements to either Bayer or Figge. Clearly there was no admission by a codefendant implicating Grooms in the agent's testimony. Only on cross-examination did the witness reveal the source of his information. Thus, a *Bruton* situation, if it can be said that one existed at all, was created by the defendant himself and not by the Government; this cannot form the basis of reversible error.

### II

On July 16, 1968 Bayer and Figge entered pleas of guilty to the bank robbery charge. On September 10, 1968 they were sentenced and immediately transported to a federal penitentiary. Grooms' trial started September 25. On the second day of the trial and after the Government had rested its case, the defendant filed a petition to require the production of Bayer and Figge as witnesses in his behalf. Further, he asked for a continuance until these witnesses could be returned from the penitentiary. The district court denied both the petition and the continuance. Under the circumstances we find no error.

■ Although different counsel represented Bayer and Figge, Grooms' attorney was fully aware that Bayer and Figge had entered pleas of guilty and had been sentenced to prison. He was therefore chargeable with the knowledge that Bayer and Figge had been transported from Chicago to the federal penitentiary. In his petition defense counsel stated that "by reason of pretrial developments" he believed that Grooms' codefendants would be used by the Government as witnesses in its case. Yet there was no showing that the government made any representation that Bayer and Figge would be returned. The record provides no basis for any assumption by

defense counsel that they would be present at the trial. Moreover it is clear that the defendant at no time prior to trial requested the Government that Bayer and Figge be produced or be kept available. A defendant is responsible for the production in court of the witnesses he desires to testify in his behalf. Thomas v. United States, 81 U.S.App. D.C. 314, 158 F.2d 97, 99 (1946). Conversely, the Government has no responsibility to call all witnesses who are competent to testify. Washington v. United States, 275 F.2d 687, 690 (5th Cir. 1960).

■ When all the relevant facts are considered, we are of the view that the district judge did not abuse his discretion in denying the petition since it was not filed until after the trial was in full progress. Litigants are charged with the responsibility of acting timely in obtaining witnesses. Gates v. United States, 122 F.2d 571, 579 (10th Cir. 1941).

### III

■ Grooms also claims that the closing argument of the prosecution was prejudicial and deprived him of his due process right to a fair trial. He first objects that the Government misstated the evidence on summation in stating that Grooms' fingerprints were found in the Plymouth and in stating that Grooms confessed that he planned the robbery. Neither statement created error. Objection was promptly made to the statement regarding fingerprints after which the following exchange took place:

> [Prosecutor]: If I said Grooms, your Honor, I misspoke. Ladies and gentlemen, I meant to say Bayer.

> The Court: You did say Grooms.

> [Prosecutor]: I apologize to the court and jury. I meant to say Bayer. Grooms' prints were never found in the Plymouth. Let me say this now: If I say anything that you do not believe that you heard from that witness stand, there is only one me taking down the testimony, and there are twelve of you. Therefore, you are

twelve times better than I am to remember what was said from that witness stand, so anything that I say that you twelve people disagree with you can completely throw out.

◼ Grooms' principal objection to the Government's closing argument lies in statements which, he contends, convey the prosecutor's personal belief as to the quality of the proof of certain elements of the case or misstate the evidence. The challenged statements were:

"Ladies and gentlemen, I submit to you that the defense has not presented one iota of believable evidence. We have a confession from this man that he planned the bank robbery, he went over the get-away route. I believe that he drove that change car—" [interrupted by defense counsel's objection].

Defendant objects that the first and third sentences of the foregoing constituted an improper assertion of the beliefs of the prosecutor as to the quality and quantity of the evidence. He objects that the second sentence relating to Grooms' "confession" that he "planned" the robbery sentence is not founded on the evidence. As to this second sentence, it is sufficient to note that agent Stratton testified of Grooms in rebuttal: "He said that he had discussed the robbery and planned it with Figge and Bayer." The argument was thus proper as to the alleged confession since it urged a reasonable inference based upon evidence properly admitted.

◼ The statements of the prosecutor challenged as improperly propounding his personal beliefs as to the quality of the evidence and the guilt of the defendant require closer examination, however. It should be clear by now that statements by counsel as to their belief or lack of belief in the veracity of evidence and in the culpability of a party have no place in the trial of cases. Not only do such comments fail to add anything in any way probative of the real issues confronting the trier of fact, but they also possess the seeds of reversible error in

that they tend to amplify the possibility that lay jurors may be misdirected from properly weighing the evidence by the implicit invitation to adopt the evidentiary assessment of the attorney. Such assertions of belief have been condemned as improper conduct which may justify disciplinary action against the attorney indulging in them by Canon 15 of the old Canons of Professional Ethics of the American Bar Association and by Disciplinary Rule 7–106(C) (4) of that organization's new Code of Professional Responsibility. Moreover, at least one of the federal circuits regards such statements as reversible error *per se*. Greenberg v. United States, 280 F.2d 472, 474–475 (1st Cir. 1960). Such a *per se* approach has not been followed in this circuit, United States v. D'Antonio, 362 F.2d 151, 155 (7th Cir. 1966), but we have recently restated the proposition, if ever it was doubted, that such personal opinions are not proper issues to present to a fact finder. United States v. Handman, 447 F.2d 853 (7th Cir. 1971).

◼ A review of the record herein, however, reveals that the defendant was represented by counsel at trial and that his counsel made several objections to various statements in the prosecutor's summation. He did not, however, object at any time to the statements arguably prohibited as injecting counsel's personal beliefs. Similarly, no objection was made at the close of final arguments, nor was a cautionary instruction specifically dealing with the problem of statements of belief by counsel ever proffered to the court. The issue was also not raised by defendant's "Motion in Arrest of Judgment, and for Judgment of Acquittal, and in the Alternative, for a New Trial" which set out twenty-nine other purported trial errors. In short, we are presented with a situation requiring us to determine whether "plain error" exists within the intendment of Rule 52(b), Fed.R.Crim.P. On the record before us, we are constrained to determine that this contention cannot appropriately be characterized as plain

error and, thus, cannot justify reversal. *See* Harris v. United States, 131 U.S. App.D.C. 105, 402 F.2d 656 (4th Cir. 1968) (Burger, J.); *cf.* Lawn v. United States, 355 U.S. 339, 359 n. 15, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958).

## IV

■ Defendant further contends that the district court improperly imposed a longer sentence upon him than those imposed upon the other participants in the crime without justification for that disparity other than the forbidden reason that defendant pleaded innocent and the others pleaded guilty. However, the fact of the disparity was called to the attention of the district judge at the time of sentencing, and the judge responded: "That is correct. Both of [the others] pleaded guilty, and if this man was the mastermind, as the jury seems to think he was, I feel that a heavier sentence should be imposed on this individual." We believe that the district judge cited a permissible reason for the disparity when he stated that he interpreted the jury's determination of guilt as meaning that the jury believed defendant masterminded the crime.

## V

Finally, defendant argues that his statement to agent Stratton was procured without properly advising him of his rights as required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). That contention is directly contradicted by the testimony of agent Stratton that, prior to questioning the defendant, he read the waiver of rights form prescribed by *Miranda* to the defendant and that the defendant stated that he understood its contents.

The judgment of the district court is affirmed.

KILEY, Circuit Judge (dissenting).

I respectfully dissent. I start with the view that there is barely enough evidence prima facie to take to the jury the question of Grooms' participation in the frustrated attempt of Figge and Bayer to escape arrest for the bank robbery.

The only evidence presented at trial is the testimony of officers Dummet and Hess identifying Grooms as driver of the Plymouth car during the elusive maneuver to avoid the first roadblock. Dummet and Hess were unable to stop the Plymouth as it passed, but in pursuit caught up to the white Ford which they stopped. The officers arrested and handcuffed Figge who was in the Ford. During this time the Plymouth was driven to the second roadblock three miles distant from the first roadblock. Bayer was arrested running from the Plymouth which had overturned in attempting to avoid the second block.

The theory of the government's proof was that some place between the roadblocks Grooms got out of the Plymouth, and Bayer got up from his Plymouth hiding place and took over as driver. If the Plymouth did not reach the second roadblock—three miles away—for 25 minutes, the theory would have some support. But there is nothing in the evidence to show that 25 minutes elapsed after the police stopped the Ford and arrested and handcuffed Figge, and the overturning of the Plymouth and Bayer's arrest three miles away. The only testimony on that point is that of officers Dummet and Hess that it took 15 minutes for them to stop the white Ford and take Figge into custody. While the police were chasing Figge, the Plymouth was presumably speeding three miles toward the second roadblock. It was stipulated at trial that an officer at the second roadblock, if he testified, would have stated that the Plymouth was approaching at 90 miles an hour.

No one saw Grooms at the second roadblock, or until he appeared later in the day at the police station. Bayer's fingerprints, not Grooms', were on the Plymouth. Agent Stratton testified that Figge and Bayer told him Grooms was not with them the day of the robbery, but had been before that day. Strat-

ton's first impression was that the identification of Grooms as the Plymouth driver was mistaken, although later investigation changed that impression. Nor is there any good reason shown why, in the three mile drive between the two roadblocks, Bayer, who was armed, permitted Grooms to get out of the Plymouth and escape, instead of escaping himself. Normally one does not expect such altruism among thieves.

It is clear that at best this was a thin case[1] for the government. The weak link was in the government's proof of the strange chain of events in which Grooms was identified by the two policemen as driver of the Plymouth, then disappeared as into thin air during the three mile drive to the second roadblock at 90 miles an hour. The police officer's weak identification is the only testimony adduced to connect Grooms to the alleged crime. This weak link was firmed up by the prosecutor's argument to the jury.

It was in the evidentiary context discussed above that the prosecutor, in my view, made prejudicial argument to the jury. As a prelude to the discussion of the argument it should be pointed out that in cross-examination of agent Stratton, Grooms' counsel asked, "What did you do?" The answer, "Well, I asked Mr. Figge and Mr. Bayer if he was on the robbery with them." He then volunteered, "They said 'No.' I said, 'Did he know about it?' They said 'Yes. He was supposed to go with us but this morning when we left for the robbery we didn't go pick him up. He was in on the planning all the way. He agreed to go on it.'" The volunteered testimony given in answer to the question was stricken on motion of Grooms' counsel and the jury was instructed to disregard what Figge and Bayer had told Stratton.

Later the prosecutor stated to the jury:

A. "I believe that he drove that change car."

B. "We have a confession from this man that he planned the bank robbery, he went over the getaway route." Grooms' counsel objected that there was no confession nor evidence that Grooms had planned any getaway. He stated that agent Stratton used the word "discussion." The district court said "It is an admission." The prosecutor then stated, "All right . . . he admitted that he planned it." The argument went on:

C. "I leave to you . . . whether or not this man is guilty whom I believe to be guilty. . . ."

### A.

The argument that the prosecutor believed Grooms drove the Plymouth was highly improper. I need not go as far as the court in Greenberg v. United States, 280 F.2d 472 (1st Cir. 1960), and hold that the naked statement is reversible error. It is enough that I think that the prosecutor's belief may have been the basis upon which the jury inferred that although the testimony as to Grooms' participation was weak, the prosecutor had some knowledge that the jury did not have that Grooms was the driver of the Plymouth and had thus participated in the robbery as an aider and abettor. This possibility is strengthened by the unexplained change of Stratton's original impression that officers Dummet and Hess were mistaken in their identity of Grooms. There is no evidence of what was discovered in a later investigation testified to by Stratton as to what changed his original impression to coincide with the views of Dummet and Hess.

---

1. I recognize, however, that even though the identification of Grooms as the Plymouth's driver is weak in itself, it is not inherently improbable or physically impossible. But the identification testimony is weakened further when considered in the framework of other circumstances at the trial which I shall now discuss.

### B.

Agent Stratton testified that Grooms told him that he had "several conversations [with Figge and Bayer] about the robbery but denied that he had at any time agreed to go on the robbery;" and that Grooms admitted "that he had several discussions with them" about the robbery. Agent Vornberger testified that Grooms told him that he had discussed this "robbery with Bayer and Figge" and also said "But I wasn't there." Neither agent said Grooms had used the word "planned" or admitted he had planned the robbery. The first use of the word "planned" was in a leading question the prosecutor put to Stratton on rebuttal, "Did Mr. Grooms admit to you . . . that he had discussed and planned the bank robbery with Figge?" Objection to the word "planned" was overruled. Then Stratton, in answering the question, for the first time said "planned." Again an objection failed. Stratton then said, "I asked him whether . . . he had gone over the planned getaway . . . and he admitted that he had with Figge." Twenty-six pages later in the transcript the prosecutor capped the insinuations by asserting, "He [Grooms] admitted planning the robbery." This progressive expansion of what Grooms said to Stratton and Vornberger was unfair, and suggests—in view of the prelude mentioned at the beginning of this discussion of arguments—an anxiety to insinuate that Grooms aided and abetted the robbery by use of the word "planning" in voluntary answers of government witnesses as well as in argument. The volunteered answer was stricken, but seems to have achieved its purpose.

### C.

Shortly after that capping statement —mentioned above—the prosecutor told the jury his belief that Grooms was guilty. This is improper argument. *See* Greenberg v. United States, *supra*, 280 F.2d at 475, n. 3. The personal opinion of the prosecutor is not an issue for the jury. United States v. Handman, 447 F.2d 853, 856 (7th Cir. 1971).

I express no view upon the guilt or innocence of Grooms. It is my opinion that he was denied a fair trial because the government presented a weak evidentiary case which was buttressed with what has appearances of deliberate use of a prejudicial vapor created by insinuation, exaggeration and argument. I would reverse the conviction and order a new trial.