492 F.2d 150
 UNITED STATES of America, Plintiff-Appellee,
v.
Raymond Bennie BAXTER, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Rodolfo Gomez MARRUFO, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Charles Thomas WARD, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Milton Norris BEASLEY, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Antonio Orzco RICO, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Estaban Gonzalez CATARINO, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Thomas RODRIQUEZ, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Cleveland PIPKINS, Defendant-Appellant.
HERNANDEZ CASES.
Group I Appeals.
 Nos. 71-2082 to 71-2087, 71-2153, 71-2140.
 United States Court of Appeals, Ninth Circuit.
 Feb. 16, 1973, Certiorari Dismissed Aug. 2, 1973, See 94
S.Ct. 16, Rehearings Denied Oct. 18, 1973,
Certiorari Denied April 15, 1974, See 94
S.Ct. 1945.
 
 Frank A. St. Sure (argued), William J. Zumwalt (argued), Patricia M. Doyle (argued), Gary D. Weatherford (argued), of Ferris, Weatherford & Brennan, San Diego, Cal., Jonathan K. Golden (argued), Burton Marks, Beverly Hills, Cal., Thomas J. Ryan, of Hunter, Dougherty & Ryan, Artie G. Henderson, San Diego, Cal., for defendants-appellants.
 James W. Meyers, Asst. U.S. Atty. (argued), Phillip W. Johnson, Sp. Asst. Atty. Gen., Harry D. Steward, U.S. Atty., San Diego, Cal., for plaintiff-appellee.
 Before HAMLEY and CHOY, Circuit Judges, and SCHNACKE, District Judge.*
 HAMLEY, Circuit Judge:
 
 
 1
 On February 5, 1969, a federal grand jury in the Southern District of California returned a two-count indictment against forty-nine individuals pertaining to the narcotics activities of Robert and Helen Hernandez. Count one charged that, beginning at a date to the grand jury unknown, and continuing to February 5, 1969, all forty-nine, and divers unknown persons, conspired to violate 21 U.S.C. 173 and 174, by importing heroin and cocaine into the United States from Mexico, and by thereafter selling, concealing and facilitating the transportation and concealment of such drugs. Count two charged that, on or about December 1, 1968, all forty-nine used telephone, wire and other means of communication in San Diego County, within the Southern District of California, in facilitating the commission of, and attempting to commit the importation, concealment, and sale of heroin and cocaine, in violation of 21 U.S.C. 174 (1964), and 18 U.S.C. 1403(a) (1964).[1]
 
 
 2
 The district court divided the fortynine defendants into three groups for trial. Group I, with which we are here concerned, consists of Raymond Bennie Baxter, Rodolfo Gomez Marrufo, Charles Thomas Ward, Milton Norris Beasley, Antonio Orzco Rico, Estaban Gonzalez Catarino, Cleveland Pipkins, Thomas Rodriquez (the eight defendants named in the caption of this opinion) and four other defendants named in the indictment.
 
 
 3
 The jury found all eight named above guilty as charged in court one, and defendants Ward and Rico also guilty on count two. Concurrent sentences were imposed upon Ward and Rico. All eight of the named individuals appeal. Their appeals have been consolidated for disposition here and will sometimes be referred to as the Group I appeals.[2]
 
 
 4
 The evidence, considered in the light most favorable to the Government, warranted the jury in finding, beyond a reasonable doubt, the following background facts:[3] From as early as 1964 through December, 1968, the husband and wife team of Robert and Helen Hernandez (Hernandezes) of Tijuana, Mexico, were in charge of an organization devoted to the smuggling of commercial quantities of heroin, cocaine and marijuana into the United States from Mexico. They had a reputation along the Mexico-California border as being the largest 'dope' peddlers in Mexico.
 
 
 5
 Robert's brother, Juan (or John) Hernandez, also of Tijuana, participated in this operation by sending customers to the Hernandezes. The latter employed operatives to bring narcotic drugs to Tijuana from such interior Mexico cities as Guadalajara, Veracruz and Mexico City. From Tijuana the narcotics were smuggled across the border into the Southern District of California and then transported into the greater Los Angeles area. Once in Los Angeles, other operatives, acting as wholesale distributors, would take control of the narcotics. They would warehouse them, usually in apartments leased specifically for this purpose, until these operatives were ready to sell the narcotics to retailers.
 
 
 6
 Apparently as a security measure, the link between the wholesale distributors and the retailers was set up so that there would be no face-to-face contact between them. Instead, the Hernandezes established an elaborate scheme of codes and telephone numbers to convey the necessary information from each wholesale distributor to the retailers he served.
 
 
 7
 When a retailer needed narcotics he would call the Hernandezes' residence and place his order. The retailer's order would then be telephonically conveyed to the wholesale distributor in Los Angeles. This information was conveyed in the form of a daily 'load list' containing the retailers' names in code, their coded telephone numbers and coded information regarding the quantity and type of narcotics to be delivered.
 
 
 8
 Then the distributor would take from his warehoused inventory the kind and quantity of heroin or cocaine needed to fill these orders and secretively place them in various locations in the greater Los Angeles area. On occasion, such narcotics would be left, in hiding, in public restrooms in gasoline stations, bars or restaurants, or in telephone booths. The distributor would then telephone the retailer and inform him as to the location of the narcotics.
 
 
 9
 The retailers would fetch the narcotics from the indicated location. They would usually pay for the goods with Western Union money orders or cashiers' checks. Occasionally they journeyed to Mexico where they would pay in cash to one of the Hernandezes or to one of the headquarters staff. The weekly gross income to the Hernandezes from this operation often ranged from eighty to one hundred thousand dollars.
 
 
 10
 As a result of a telephone conversation with Helen Hernandez, Donald Lannom became a distributor for the organization in the Los Angeles area in 1966. He kept his inventory of heroin and cocaine in a rented apartment. As a distributor, Lannom would telephone Helen Hernandez at her residence twice each day, once in the morning and once in the evening. She would on these occasions, provide Lannom with the names of the retailers who had placed orders, their telephone numbers, and the nature of the order.[4] He would then deliver the ordered narcotics to the retailers as described above.
 
 
 11
 In January, 1968, Lannom left the United States for Mexico where he continued to deal in narcotics as a member of the Hernandez organization. A major part of his duties consisted of bringing large quantities of narcotics up from the interior cities of Mexico to Tijuana. In August, 1968, Robert Hernandez was injured in a shooting incident, leaving him totally blind. Lannom then became Robert's bodyguard and chauffeur and helped maintain the Hernandez residence while the Hernandezes were away.
 
 
 12
 Wesley Richard Wright was introduced to the Hernandezes by his friend Lannom, and, starting about October 10, 1968, Wright became a part of the headquarters staff at the Hernandez residence. Wright became the 'telephone man' of the organization. He received orders on the telephone for narcotics and relayed that information to the distributor working in the Los Angeles area. As part of this function Wright would jot down the order information he received during the day on scratch pads from which he subsequently prepared the 'load lists' referred to above. The Los Angeles distributor was then Roy Cohn, a defendant in the Group III trial.[5]
 
 
 13
 Wright was also required to take care of the bookkeeping for the Hernandez narcotics operation. The main book he used was known as the 'customer book' (exhibit 2) and was given to Wright by Helen Hernandez. This was a small black looseleaf notebook containing coded names used by the customers (retailers), their telephone numbers, a record of the amounts of narcotics smuggled north for them and a record of the money received in return.
 
 
 14
 Wright did not debit the account for goods received until they had actually been physically delivered. However, these entries were made within a reasonable time after delivery, such as twenty-four hours. The entries in the 'customer book' indicate that the sale of narcotics to retailers was in quantities of not less than one ounce of heroin or cocaine, and many orders were for several ounces.
 
 
 15
 In the period from October 1, 1968 through December 7, 1968, the Hernandez operation transferred to the retailers in Los Angeles approximately fiftytwo and three-tenths pounds (eight hundred and thirty-seven ounces) of heroin and eight and nine-tenths pounds (one hundred and forty-two ounces) of cocaine. The wholesale value of these transactions was reflected on the Hernandezes' books at $344,725. The going price received by the Hernandezes was five hundred and fifty dollars an ounce for cocaine and three hundred and twenty-five dollars an ounce for heroin.[6] Wright also used a columnar book (exhibit 3), in which he kept track of money and other transactions in connection with the operation.
 
 
 16
 In addition to his telephone and bookkeeping duties Wright also had some responsibility in arranging for the transportation of narcotics across the border to the warehouse in the United States. This included contacting Tejano ('Tex'), who cut and packaged the narcotics in Tijuana for Robert Hernandez, to prepare a 'load.' Wright would then coordinate the delivery of the load with the smuggler, a woman known as 'Katy' or 'Kathy.' Next, Wright would call the distributor in the Los Angeles area (Roy Cohn when he was operating) who would give Wright a name and telephone number for 'Kathy' to call for further instructions.
 
 
 17
 On November 17, 1968, Lannom consulted with his attorney and federal agents concerning Lannom's decision to return to the United States. Wright, a fugitive felon, met with federal agents on December 1, 1968, and he also discussed plans to leave the Hernandez organization.
 
 
 18
 Both Lannom and Wright continued working for the Hernandezes. This was apparently in accord with the arrangements they made with the federal agents to the effect that Lannom and Wright would continue performing their duties as usual while keeping the agents informed as to current developments. About the middle to December, 1968, Wright arranged to smuggle narcotics across the border for Roy Cohn. Wright contacted 'Kathy' and gave her the necessary instructions, and arranged the transfer of narcotics from 'Tex.'
 
 
 19
 Helen Hernandez directed Wright to smuggle the narcotics across the border. As a result, at approximately 3:05 p.m., December 16, 1968, U.S. Customs Agent Fernando A. Maldonado met a woman in San Ysidro, California, who answered to the name of 'Emma.' She turned over to the agent a paper bag which contained ten and eight-tenths pounds of heroin, most of which was of a purity of between thirty-five and forty percent. Both Lannom and Wright fled Mexico across the border into the United States on that day.
 
 
 20
 1. Proof of Conspiracy and Severance for Trial
 
 General Considerations
 
 21
 Each of the eight defendants involved in this Group I appeal contends: (1) the evidence was insufficient to establish that the individual defendants participated in an over-all conspiracy of the kind charged in the indictment; (2) if the Government proved that each individual defendant participated in a more limited conspiracy, such defendant was prejudiced by having that issue tried in the context of an over-all conspiracy and (3) by reason of the likelihood of such prejudice the trial court erred in denying the timely motion of each defendant for severance and separate trial.
 
 
 22
 The kind of conspiracy which the Government here sought to prove consisted of: (1) a central core organization consisting of the Hernandezes' headquarters staff and associated individuals engaged in transporting, preparing, packaging and smuggling the narcotics, (2) wholesale distributors in the Los Angeles area, and (3) individual narcotics retailers located in the Los Angeles area, including the eight defendants involved in this Group I appeal.
 
 
 23
 To prove this conspiracy, and participation therein by the defendant retailers, the Government had to show, among other things, that the defendant retailers agreed to effectuate the described criminal design. Daily v. United States, 282 F.2d 818, 820 (9th Cir. 1960). One way the Government could prove this would be to show that each of the defendant retailers worked directly with the other defendant retailers, as well as the Hernandez headquarters staff and other organization personnel, in promoting the over-all scheme.
 
 
 24
 As we view the evidence, the Government did not, for the most part, prove direct contact and connivance between the defendant retailers. However, even though the defendant retailers did not directly conspire with each other in this over-all undertaking, if each knew, or had reason to know, that other retailers were involved with the Hernandez organization in a broad project for the smuggling, distribution and retail sale of narcotics, and had reason to believe that their own benefits derived from the operation were probably dependent upon the success of the entire venture, the jury could find that each had, in effect, agreed to participate in the over-all scheme. See Blumenthal v. United States, 332 U.S. 539, 557-558, 68 S.Ct. 248, 92 L.Ed. 154 (1947);[7] United States v. Friedman, 445 F.2d 1076, 1080 (9th Cir. 1971); Daily, 282 F.2d at 820. This would be true even though the individual defendants were not aware of the identity, number or location of the other participating retailers. See Friedman, 445 F.2d at 1080.[8]
 
 
 25
 In applying these principles, however, it is important to avoid confusing the similar purposes of numerous separate adventures of like character, with the single purpose of one over-all scheme. Rocha v. United States, 288 F.2d 545, 553 (9th Cir. 1961), quoting from Canella v. United States, 157 F.2d 470, 476-477 (9th Cir. 1946). While the individual defendants may have entered a conspiracy with some of the other indicted co-conspirators, the Government had the burden of connecting each defendant directly or circumstantially with the larger over-all scheme. Daily, 282 F.2d at 821-822.
 
 
 26
 Thus if, at most, the Government proved that a particular defendant purchased narcotics from the Hernandez organization without reason to believe that his ability to do so was because of the existence of an over-all conspiracy involving several retailers, the jury would not be warranted in finding that such defendant had thereby participated in an over-all conspiracy. In substance, this was the holding of this court with regard to defendant Quinn, in Daily v. United States, 282 F.2d 818 (9th Cir. 1960). Even though defendant Quinn in that case knew of the method by which the scheme operated, the Government failed to show, directly or inferentially, that he knew of the existence of other conspirators besides himself and two others.[9]
 
 
 27
 It is true, however, that even if the Government proved, not one over-all conspiracy but a series of limited conspiracies involving individual defendant retailers with the core organization, this would not necessarily require reversal. It would show a failure on the part of the Government to prove participation in an over-all conspiracy. But it would leave the question of whether a fatal variance resulted in trying the defendants under the single conspiracy charge whereas the proof showed only limited conspiracies. This was the precise question dealt with in Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), where it was held that the variance in that case was not fatal, and Kotteakos v. United States,328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), where it was held that the variance in that case constituted reversible error. A variance is not fatal if the proof is confined to the conspiracy of which the defendant is convicted. Berger v. United States, 295 U.S. at 81, 55 S.Ct. 629.
 
 
 28
 There also lurks in this branch of the case the question of whether, apart from the matter of variance, the prejudice inherent in a trial of many defendants on a broad conspiracy count wherein defendants strongly urged that, at most, limited conspiracies were shown, rendered the denial of the several motions for severance a reversible abuse of discretion.
 
 
 29
 With these considerations and principles in mind we turn to an examination of the record as to each of the eight defendants.
 
 
 30
 Defendant Baxter. Under the evidence considered in the light most favorable to the Government, Baxter had direct contact with Helen Hernandez, Wright, Lannom and Roy Cohn. The Hernandez 'customer book' contained references to Baxter as 'Bee Bee,' with his coded telephone number and the price per ounce he paid for heroin and cocaine. During a forty-eight-day period in the latter part of 1968, this book reflects the fact that Baxter purchased from the Hernandez organization nine ounces of heroin and one ounce of cocaine, having a sales value of $3,475.00. It was Baxter's practice to pay for drugs purchased from the Hernandez organization by journeying to Tijuana with the cash, telephoning the Hernandez headquarters and, by appointment, transferring the money to Wright or Lannom at some agreed-upon place in Tijuana. Cohn was the distributor of the narcotics purchased by Baxter.
 
 
 31
 The Government did not produce any direct evidence that Baxter knew any of the other narcotics retailers named in the indictment. Nevertheless the jury could reasonably find that a narcotics smuggling and distribution operation of the size that Baxter knowingly dealt with must have had a substantial number of retail outlets such as his own. Baxter was shown to be an experienced narcotics operator, and the jury could reasonably find from the clear and unequivocal evidence that Baxter must have known that the Hernandez operation was of such a size and character that it must involve a circle of retailers. Just as the participation of other retailers in the general scheme must have been apparent to Baxter, as a knowledgeable retailer, so, too, he must have realized that his own participation in the over-all undertaking substantially contributed to the success of the venture as a whole; or so the jury could have found.
 
 
 32
 Having in view the background evidence and that which pertains specifically to Baxter, as reviewed above, and the general considerations and principles to which reference has been made, we hold the evidence sufficient to establish the existence of the over-all narcotics conspiracy, as charged in the indictment, and Baxter's participation therein. As to Baxter, then, there was no variance between the indictment and the proof and no abuse of discretion in refusing to sever his trial.
 
 
 33
 Defendant Marrufo. Marrufo was listed in the Hernandez 'customer book' by the code name 'Chato,' with a specified telephone number listed to 'Jose Banda' at the address where Marrufo was living. According to this record, Marrufo paid three hundred and twenty-five dollars per ounce for the over two pounds (thirty-nine ounces) of heroin he purchased from the Hernandezes during a fifty-two-day period in late 1968, this data being reflected in the Hernandezes' 'customer book.' The sales value of these purchases was $12,675. Thirty-eight telephone calls were made to the Hernandez residence from the telephone listed to 'Jose Banda' during the period from September to December, 1968. Marrufo must have been in contact not only with persons at the Hernandez headquarters, but also with Cohn or some other distributor in the Los Angeles area.
 
 
 34
 As in the case of defendant Baxter, we believe the jury could reasonably find that this knowledgeable and experienced retail dealer in narcotics, who had frequent contacts with the Hernandez organization, must have been aware that the operation involved a circle of narcotics retailers of which he was one. The jury was also warranted in finding that Marrufo must have realized that his own extensive participation in the operation contributed substantially to the success of the entire venture, from which venture he personally profited.
 
 
 35
 On the same reasoning which we applied in the case of defendant Baxter, we hold that the evidence of the over-all narcotics conspiracy, and Marrufo's participation therein, is sufficient to support his conviction on count one. It follows that, as to Marrufo, there was no variance between the indictment and the proof and no abuse of discretion in refusing to sever his trial.
 
 
 36
 Defendant Ward. Ward had personal telephonic contact with Robert and Helen Hernandez during much of 1968. He was listed in the Hernandezes' 'customer book' under a variety of names, including 'Burch,' with a coded telephone number. These records show that Ward purchased over a pound of heroin from the Hernandezes during a forty-four-day period in October and November, 1968, paying a total of six thousand five hundred dollars. Between January 13 and November 2, 1968, Ward sent the Hernandezes Western Union money orders aggregating eleven thousand seven hundred dollars.
 
 
 37
 The method whereby Ward received the narcotics was as described earlier in this opinion with reference to the activity of the wholesale distributors. Ward knew Roosevelt Walker, one of the defendants in the Group II appeal, and, according to the evidence, Ward stated that when he heard of Walker's arrest 'he should have left town.'
 
 
 38
 In view of the size of Ward's narcotics operations, all of which involved the Hernandez organization, his definite knowledge of Walker's participation therein, his manner of receiving the narcotics through an efficient distribution system, and the general background facts developed in the evidence, the jury could find that Ward must have been aware of the general conspiracy involving many retailers and that his own activity contributed to the success of the over-all scheme.
 
 
 39
 Accordingly, we hold that as to Ward there was no variance between the indictment and the proof and no abuse of discretion in refusing to sever his trial. In view of this determination we need not consider whether, giving application to the concurrent sentence rule, as set forth in Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), the concurrent sentence imposed upon Ward because of his conviction on count two of the indictment rendered it unnecessary to consider the sufficiency of the evidence on the conspiracy count.
 
 
 40
 Defendant Beasley. Beasley appears not to have raised, on appeal, the question of the sufficiency of the evidence to prove an over-all narcotics conspiracy, and his participation therein. In any event we believe the evidence was sufficient in these respects. By means of referring to arguments advanced in other briefs, Beasley may have raised the question of whether the district court abused its discretion in denying his motion to sever his trial. We hold there was no such abuse of discretion.
 
 
 41
 Defendant Rico. Rico is listed in the Hernandez 'customer book,' together with his coded telephone number and the price per ounce he paid for heroin. The entries in this book reflect the sale of eleven ounces of heroin to Rico with a sales value of $3,575, during a fifty-one-day period late in 1968. Eight Western Union money orders addressed to 'Roberto Hernandez,' at the Hernandez residence, were signed by Rico, sometimes under the name 'Ramon Acosta.' The latter name was also recorded in the 'customer book.' Juan Hernandez's telephone number was found on a slip of paper found in Rico's wallet when he was arrested.
 
 
 42
 The evidence linking Rico to the over-all conspiracy may be somewhat thinner than in the cases of Baxter, Marrufo, Ward and Beasley. Nevertheless, we think it was adequate, having in view the same considerations discussed in connection with these other defendants. We therefore hold that there was no variance between the indictment and the proof in the case of Rico, and there was no abuse of discretion in refusing to sever Rico's trial. The observations made above with respect to defendant Ward and the concurrent sentence rule are equally applicable to defendant Rico.
 
 
 43
 Defendant Estaban Catarino. While Catarino does not question the sufficiency of the evidence to prove the conspiracy, and his participation therein, he does assert that the trial court erred in refusing to sever his trial. We therefore consider the sufficiency of the evidence to connect this defendant with a general conspiracy.
 
 
 44
 The Hernandez 'customer book' contains coded references to Catarino and his telephone number, together with the price he was to pay for heroin. Seventeen ounces, having a sales value of $5,525, were sold to him by the Hernandez organization during a fifty-one-day period in late 1968. Lannom met Catarino on three occasions, at a Tijuana racetrack, to receive payments in cash. On at least two of these occasions, Helen Hernandez asked Lannom to meet Catarino for this purpose. Wright received at least three telephone calls from Catarino with reference to additional meetings at the racetrack to receive payments.
 
 
 45
 During the period of July, 1968 through January, 1969, Catarino made eleven telephone calls from his Los Angeles home to the Hernandez headquarters, and twenty telephone calls to the Juan Hernandez telephone number.
 
 
 46
 While this is a fairly close case on the evidence, we think the jury, upon consideration of this evidence along with the background facts concerning the general conspiracy, could infer that Catarino must have realized that a wide circle of retailers was being served by the Hernandezes and that his own benefits derived from the operation were predicated upon the success of the entire venture. Our above-stated reasoning in holding the evidence of conspiracy sufficient as to other defendants is equally applicable here.
 
 
 47
 We therefore hold that there was not, as to defendant Catarino, a variance between the indictment and proof, and there was no abuse of discretion in refusing to sever his trial.
 
 
 48
 Defendant Rodriquez. In the Hernandez 'customer book,' Rodriquez is referred to as 'Tomate,' and his coded telephone number is recorded, together with a 'three hundred seventy-five dollar' price per ounce of heroin. The entries in this book reflect the sale of two pounds of heroin to Rodriquez, with a sales value of ten thousand four hundred dollars, during a sixty-one-day period in late 1968. Rodriquez was shown to have been in contact with Robert and Helen Hernandez, Lannom, Wright and Cohn. On several occasions Rodriquez conversed directly with Robert and Helen Hernandez at a hospital in Tijuana or at their home. During the period of July, 1968 through January, 1969, forty-five telephone calls were made from Rodriquez' telephone to the Hernandez headquarters, and seventeen telephone calls were made to the Juan Hernandez number in Tijuana.
 
 
 49
 As in the case of the other Group I defendants, we think the extent of Rodriquez' contact with and utilization of the Hernandez narcotics operation, including his personal associations with several members of that group, entitled the jury to find that he must have been aware that the operation served a circle of retailers such as himself, and that his own benefits from the operation were dependent upon the success of the scheme as a whole.
 
 
 50
 Accordingly, we hold that the Government proved Rodriquez' participation in the general scheme. It follows that, as to this defendant, there was no variance between the indictment and proof and no abuse of discretion in refusing to sever his trial.
 
 
 51
 Defendant Pipkins. Pipkins does not, in his brief on appeal, specifically argue that the evidence is insufficient to prove a general conspiracy as charged, or his participation therein. However, the does adopt the arguments 'made on behalf of all co-appellants whose cases have been consolidated on appeal under the title 'Hernandez Conspiracy'.' We deem this adequate to put in question the sufficiency of the evidence produced in the Group I trial to support Pipkins' conviction on count one, but we deem it improper to consider, on this question, the evidence produced in the other trials involving the alleged Hernandez conspiracy.
 
 
 52
 Pipkins' nickname 'Skeeter' appears in the Hernandez 'customer book,' together with his telephone number, the prices to be charged him for heroin and cocaine, and the fact that transactions with him would be for cash. The entries in the Pipkins section of this record indicate that twenty-five ounces of heroin and twenty-two ounces of cocaine were sold to this customer, with a sales value of $20,225, during a sixty-eight-day period in late 1968.
 
 
 53
 Fifty-seven negotiated Bank of America money orders, payable to Robert Hernandez, with a total face value of $17,625, and with Pipkins' handwriting on each, were introduced into evidence. Numerous telephone calls from Los Angeles telephone numbers to the Hernandez headquarters were traced to Pipkins during the period of August through December, 1968. The evidence indicates that, in addition to personnel at the Hernandez headquarters, Pipkins had been in contact with the wholesale distributor, Cohn, and one of the narcotics retailers, Roosevelt Walker.
 
 
 54
 In our opinion, the jury could find that one who had carried on such an extensive narcotics business with the Hernandezes, and who had the indicated contact with that organization, must have known that he was but one of a circle of narcotics retailers, each of whom benefited by the participation of all in a conspiratorial arrangement embracing the entire group. The evidence introduced in the Group I trial was accordingly sufficient to support the jury verdict that Pipkins knowingly participated in a general conspiracy as charged in the indictment. Hence, as to Pipkins, there was no variance between the indictment and proof and no abuse of discretion in refusing to sever his trial.
 
 II. Admissibility of Hernandez Documents[10]
 
 55
 Several defendants attack the admissibility of certain key items of evidence in the Government's case consisting of records of the Hernandez operation. They include the 'customer book' referred to above, a separate notebook kept by Richard Wright for the purpose of explaining to himself what he was recording under the formal system created by Mrs. Hernandez, and other miscellaneous papers and notes. Wright brought all the documents (hereafter referred to as simply 'the Hernandez documents') with him when he defected from the Hernandez fold and turned the records over to Government agents.
 
 
 56
 Defendants base their challenge to the admission of the Hernandez notebooks on several grounds: Wright's testimony was insufficient to authenticate the records;[11] they were seized in violation of the appellants' Fourth Amendment rights;[12] admission of the records violated their Sixth Amendment rights to confront and cross-examine Mrs. Hernandez as to the entries she made in the notebooks;[13] and the records do not meet the test as 'business records' within the definition of 28 U.S.C. 1732(a). Only the final ground merits discussion.
 
 
 57
 To meet the standard of section 1732(a), a given document must be 'made in (the) regular course of any business' and it must be 'the regular course of such business to make such memorandum or record at the time of such act . . ..' In determining whether a document meets this test, it is important to examine 'the content and method of preparation of the (particular) document . . ..' La Porte v. United States, 300 F.2d 878, 880 (9th Cir. 1962). A review of the evidence in the instant case persuades us that the Hernandez notebooks were prepared pursuant to an inherently reliable standard operating procedure and are within section 1732(a). United States v. Lange,466 F.2d 1021 (9th Cir. 1972).
 
 
 58
 The principles of efficient accounting apply just as readily to an illicit enterprise as they do in a licit business. Arena v. United States, 226 F.2d 227 (9th Cir. 1955). In Arena, the running accounts of a gambling operation were held to be 'business records.' In the instant case, Richard Wright was under a special incentive to keep accurate records: the Hernandezes were harsh with persons out of favor.
 
 
 59
 Several defendants attack the records because the use of nicknames and code names was ambiguous. However, there is sufficient foundation in the rest of the evidence to tie up the records with the named defendants. Wright testified that Mrs. Hernandez issued emphatic instructions when she first trained him that orders were to be accepted only from persons using the code names or nicknames already entered by her in the book. If any new person wanted to establish an 'account,' Wright was first to clear it with her.
 
 
 60
 The only entries Wright actually made in the book were specific responses to phone calls from persons who identified themselves under the appropriate names. Later, particular defendants were identified by Hernandez runners, who testified that the defendants were the persons who operated under the code names. Wright's testimony and the notebooks established the first circumstantial element of this identification. The slight extent that the code name entries vary from the runners' testimony was a matter of weight for the jurors to assess, rather than a matter affecting the admissibility of the notebooks. La Porte v. United States, supra, 300 F.2d at 880; United States v. Kimmel, 274 F.2d 54, 57 (2d Cir. 1960).
 
 
 61
 The records were also incomplete because Wright removed the pages which might incriminate himself or his friend Lannom, who also defected to the Government. This deficiency in the records does not change the fact that the accuracy of the remaining pages was sufficiently established.
 
 
 62
 Defendants next contend that the notebooks were inherently unreliable because Wright prepared them for the purpose of litigation, after he agreed to help the Government approximately two months before the actually delivered the records. This argument is based on Palmer v. Hoffman, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943), affirming 129 F.2d 976 (2d Cir. 1942); cf. United States v. De Georgia, 420 F.2d 889, 894-895 (9th Cir. 1969) (Ely, J., concurring). It is true that business records prepared specifically to assist in imminent litigation are unreliable, because they are likely to be self-serving in a way that cannot be scrutinized by cross-examination at trial. However, the test is not the motivation of the employee preparing the record, but the function served by the records in the operation itself. There is no doubt that the Hernandezes continued to depend upon the notebooks, even after the date Wright agreed to cooperate with the Government. The entries made after that date were still prepared in the regular course of the Hernandez enterprise.
 
 
 63
 Finally, defendants argue that, assuming the notebooks were admissible, they should not have been admitted if Wright's testimony about the same events was also admitted. Mitchell v. American Export Isbrandtsen Lines, Inc., 430 F.2d 1023, 1029 (2d Cir. 1070); cf. Wilke v. United States, 422 F.2d 1298, 1299 (9th Cir. 1970) and 4 Wigmore on Evidence, 1124, pp. 194-195 (1940). However, this rule applies only if the oral testimony is substantially identical to the written document. Here, the notebooks had independent significance, at least with regard to the entries made by Mrs. Hernandez. Moreover, the entries made by Wright showed details which he could not remember independently, even after refreshing his recollection. This is sufficient to distinguish the use of the notebooks from Wright's testimony.
 
 
 64
 In sum, no error was committed in admission of the Hernandez documents.
 
 III. Admissibility of Telephone Records
 
 65
 All of the Group I defendants argue that their telephone records were obtained by the Government in violation of 47 U.S.C. 605, and in violation of their Fourth Amendment rights. On these grounds they contend that the district court judge who acted on pretrial motions erred in denying their pretrial motions to suppress those records, and the trial judge erred in admitting these telephone records into evidence.
 
 
 66
 The records in question are principally toll and billing records showing the dates and times of long distance telephone calls, the numbers of the calling and receiving telephones, and the names and addresses of the persons to whom the calling telephones were registered. These records do not include any reference to the subject matter or contents of telephone messages.
 
 
 67
 The manner in which the Government obtained these telephone records appears to be accurately described in defendant Estaban Catarino's brief. Douglas A. McCombs, United States Customs Agent, was in charge of briefing the arrest teams prior to the arrest of most of the defendants on December 17, 1968. On approximately December 12, 1968, he conducted briefings and relayed information to the teams as to what persons were to be arrested. The identification of the defendants was determined by contacting Pacific Telephone and Telegraph Company and obtaining the names and addresses of the subscribers that matched the telephone numbers recorded in the Hernandez 'customer book.'
 
 
 68
 McCombs was not able to recall whether the information he received from the telephone company was oral or written, or whether he received it personally, or another agent received it. McCombs also requested the telephone company to supply billing information. It was McCombs' recollection that, in response to these requests, and in advance of the issuance of any subpoena, the Government received substantially all of the information contained in the exhibits later introduced at the trial. Subsequently, in April, 1969, a grand jury subpoena was issued of these records.
 
 
 69
 In support of their position defendants principally rely upon the first sentence of 47 U.S.C. 605, as amended June 19, 1968 (82 Stat. 223), quoted in the margin.[14] It will be observed that the first sentence of section 605, as amended, prohibits certain action by any person 'receiving, assisting in receiving, transmitting or assisting in transmitting, any interstate or foreign communication by wire or radio . . ..'
 
 
 70
 The evidence in the case before us does not indicate that the Government obtained any telephone toll or billing records from any persons having the duties described in the first sentence of section 605, namely persons receiving, assisting in receiving, transmitting or assisting in transmitting of interstate or foreign communication by wire or radio. It follows that there was no violation of the first sentence of section 605, as amended. See Bubis v. United States, 384 F.2d 643, 646 (9th Cir. 1967).[15]
 
 
 71
 We therefore need not consider whether, in any event, the described Government request of the telephone company for such information as was supplied constitutes 'other lawful authority' under section 605, thus fulfilling an exception to the proscription set out in the first sentence of that section.
 
 
 72
 Defendants also rely on the second part of section 605, consisting of all but the first sentence. This part of section 605, as amended June 19, 1968, is quoted in the margin.[16] Prior to the 1968 amendment, this part of section 605 pertained to 'any communication,' which would include telephone communication. The 1968 amendment, as indicated in note 16, limited the application of this part of section 605 to 'any radio communication.' It follows that this part of section 605, in the form in effect at the time the Government obtained the telephone records in question, is totally inapplicable to telephone records.[17]
 
 
 73
 Defendants also argue that the divulgence of telephone company toll and billing records prior to the issuance of a subpoena violated their Fourth Amendment rights as declared in Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). In Katz, the Court held that what an individual 'seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected' under the Fourth Amendment. Id. at 351-352, 88 S.Ct. at 511. But the Fourth Amendment does not provide for a general constitutional right to privacy. Id. at 350, 88 S.Ct. 507. Instead, the test of whether a seizure prior to adherence to judicial processes violates the Fourth Amendment is whether there is an invasion of the defendant's 'constitutionally justifiable expectations of privacy.' United States v. White, 401 U.S. 745, 751, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971).
 
 
 74
 Telephone subscribers are fully aware that records will be made of their toll calls. United States v. Covello, 410 F.2d 536, 542 (2d Cir. 1969). This Court has held that the expectation of privacy protected by the Fourth Amendment attaches to the content of the telephone conversation and not to the fact that a conversation took place. United States v. Fithian, 452 F.2d 505, 506 (9th Cir. 1971). The defendants have failed to show a violation of their Fourth Amendment rights.
 
 
 75
 IV. Admissibility of Telegraphic Money Orders
 
 
 76
 Defendants contend that telegraphic money orders and money order applications were obtained by the Government in violation of 47 U.S.C. 605, and that their admission in evidence was therefore reversible error.
 
 
 77
 All of the defendants appear to recognize that if the money orders and applications were obtained pursuant to subpoena, then the requirements of section 605 were met. See United States v. Haili, 443 F.2d 1295, 1299 (9th Cir. 1971). Thus it was necessary for defendants to establish that the Government obtained these documents without the use of subpoenas.
 
 
 78
 We find no record support in the Group I trial for such a factual contention by defendants. The pertinent testimony is that of Mrs. Jane Buelow, Western Union custodian of the money order records which were admitted. She testified that she had released no information concerning the money orders and applications to any Government agent or agency except upon the presentation of a valid subpoena.
 
 
 79
 Mrs. Buelow also testified that she had sent to the San Diego Western Union office, at its request, confirmation of the existence, but not the details, of certain money orders which she later released under subpoena. She added that she thought the San Diego request had been pursuant to subpoena, but was not certain of this. No other evidence was produced by either side as to whether the records had actually come to Government attention through the San Diego Western Union office and, if so, whether with or without a subpoena.
 
 
 80
 In these circumstances, we hold, the defense failed to satisfy its burden of proving that the records in question had come to Government attention in a manner violative of 47 U.S.C. 605. See Nolan v. United States, 423 F.2d 1031, 1045 (10th Cir. 1970).
 
 V. Searches and Seizures[18]
 
 81
 Unlawful search and seizure arguments are presented by defendants Marrufo, Catarino, Pipkins and Rodriquez. Each of these, of course, depends upon its particular facts, but certain general principles are clear.
 
 
 82
 Since the searches and seizures here occurred prior to the decision in Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), and the standards announced in that case are not retroactive, Williams v. United States, 401 U.S. 646, 651, 91 S.Ct. 1148, 28 L.Ed.2d 388 (1971), it is conceded that Chimel is not applicable. Defendants argue, however, that the searches and seizures here violated pre-Chimel standards.
 
 
 83
 In the case of the above defendants, the challenged searches and seizures occurred at their residences and were incident to their arrests. All of these arrests occurred during the early morning of December 17 or 18, 1968. In each instance, there were arrest warrants but no search warrants.
 
 
 84
 Customs agents, accompanied by a deputy sheriff, went to Marrufo's apartment with warrants for the arrest of Marrufo and Connie Banda, a friend of his. The federal officer knocked loudly on the door and announced loudly his official status and purpose. There was a scurrying noise inside and the deputy, peering through an aperture into the apartment, called out that Marrufo was 'flushing.' The officers then broke into the apartment. In the bedroom they arrested Banda while Marrufo struggled with some of them in the bathroom. A container of heroin was retrieved from the toilet. Upon being brought into the living room, Marrufo responded to the nickname 'Chato' found in the Hernandez records and was arrested. During this episode the entire apartment was searched and one hundred and sixty packets containing heroin were found on a closet shelf. These narcotics were received in evidence.
 
 
 85
 Estaban Catarino and his wife Martha were arrested by United States customs agents who knocked on their front door and announced that they were federal officers and had an arrest warrant. Receiving no response but hearing movement inside, they forced open the door. Martha was located immediately, arrested and advised of her rights. Estaban was not in sight. Searching for him, the agents spotted an adjacent garage; one of them knocked on the garage door and made a similar announcement. Estaban then opened the door and was arrested and advised of his rights and of the status of the arresting officer. The entire residence was searched and various objects were seized and introduced in evidence.
 
 
 86
 Pipkins was arrested at his apartment. He admitted the agents after peering at them through a window and being told their position and mission. He was arrested in the living-dining area; thereafter the apartment was searched and various objects connecting Pipkins with the operation were seized and admitted into evidence.
 
 
 87
 Rodriquez was arrested in his room, which appears to have been a single room on the second floor of a building. The agents announced their identity and purpose, knocked twice on a door which apparently opened into an accessway to various rooms including Rodriquez's and got the impression that someone inside was refusing to open the door. The door was then broken down and the agents proceeded to Rodriquez's room. The testimony was in conflict as to whether the door was open or closed, but in any event Rodriquez was informed that the agents were federal officers with an arrest warrant. The room was quite small, seven by nine feet. Again there was conflicting testimony as to whether or not, after his arrest, Rodriquez remained in the room while the search was conducted. Nevertheless, several items connecting Rodriquez with the Hernandez operation were seized and put in evidence.
 
 
 88
 As mentioned above, the question before us is whether these searches and seizures were in conformity with pre-Chimel standards. Although there are slight factual variations, the question as to all these defendants is basically whether a search of the entire residence in which the defendant was present, pursuant to a lawful arrest but without a search warrant, was lawful under those standards.
 
 
 89
 This court has recently held that pre-Chimel searches and seizures incident to a lawful arrest are controlled by Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947). Taylor v. Arizona, 471 F.2d 848 (9th Cir. 1972).
 
 
 90
 Contrary to the contention of some defendants, there is no showing that what we have here was 'a general exploratory search for merely evidentiary materials.' Harris v. United States, supra, 331 U.S. at 150, 67 S.Ct. at 1101. This concept does not exclude the fruits of a search for evidence which would aid in conviction for a particular crime. Warden, Maryland Penitentiary v. Hayden, 387 U.S. 294, 306-307, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). A 'general exploratory search' of the proscribed type, as delineated by the courts, is one for the purpose of establishing that an unrelated offense has been committed. Many if not most of the details of the Hernandez operation were known to the officers prior to these arrests, and evidence connecting these defendants to it was available. Nor is it decisive that search warrants could have been obtained prior to the arrests, as the Government concedes. Harris, supra, 331 U.S. at 150-151, 67 S.Ct. 1098.
 
 
 91
 That the searches extended beyond the immediate area in which the defendants were arrested does not render it unlawful under pre-Chimel standards. The extent of the search is determined by the nature of the materials sought and where they were likely to be kept, Harris, supra, 152-153, 67 S.Ct. 1098. The materials sought here were narcotics, address and telephone books and the like pertaining to the Hernandez operation, which, as we have seen, was largely conducted by telephone. It could not be assumed that these objects would be left lying about, since they were small and easily concealed. A proper search would have to extend to pants pockets and closet shelves, where certain of the objects were in fact found.
 
 
 92
 In Chimel, the Court recognized that the extensive search there involved would have been lawful under Harris, 395 U.S. at 766, 89 S.Ct. 2034.
 
 
 93
 We conclude that the searches and seizures incident to the arrests of these defendants were lawful and evidence thereby obtained was properly received.
 
 VI. Photographic Identification of Baxter
 
 94
 Appellant Baxter contends that the trial court erred in failing to exclude the testimony of Wright and Lannom identifying Baxter as the 'Bee Bee' referred to in the Hernandez 'customer book.' He asserts that this testimony was given subsequent to an impermissibly suggestive pretrial photograph identification procedure and that a reversal is required under Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).
 
 
 95
 The Government correctly points out that no objection was made to the in-court identification at the trial. Therefore, the question is properly before this court only if the failure to exclude the identifications was a plain error or defect affecting substantial rights. Fed.R.Crim.P. 52(b); United States v. Machado, 457 F.2d 1372 (9th Cir. 1972); Davis v. United States,425 F.2d 673 (9th Cir. 1970). The plain error rule is invoked only in special situations, such as a denial of due process, in which 'it appears to be necessary in order to prevent a miscarriage of justice or to preserve the integrity and reputation of the judicial process.' Davis, 425 F.2d at 674. Thus, the question before this court is whether the pretrial procedure by which Lannom and Wright identified a photograph of appellant as 'Bee Bee' was so impermissibly suggestive as to create a very substantial likelihood of misidentification. If so, the admission of their eyewitness identifications at the trial constituted a denial of dur process of law.
 
 
 96
 On three separate occasions Helen Hernandez directed Lannom to meet a person known as 'Bee Bee' to receive some money from him. The first meeting took place in the latter part of August of 1968, the second ten days or two weeks later, and the final meeting occurred five or six weeks after the second meeting. When Wright was working at the Hernandez residence he received three telephone calls from a man who identified himself as 'Bee Bee.' Following each call Wright met 'Bee Bee' and received money from him. The first meeting occurred on October 21, 1968, the second on November 2, 1968, and the third on December 7, 1968.
 
 
 97
 Shortly after leaving the conspiracy and returning to the United States, on December 16, 1968, Lannom and Wright were shown between one hundred and one hundred and fifty photographs. No photograph of Baxter was included and neither Lannom nor Wright identified any of the photographs as that of the man they knew as 'Bee Bee.' Baxter was arrested during the latter part of December of 1968. In January of 1969, Lannom was shown a single photograph of Baxter and identified it as a picture of 'Bee Bee.' Wright then entered the room and also identified the photograph as a picture of 'Bee Bee.'
 
 
 98
 At the trial, Lannom and Wright both made in-court identifications of Baxter as the man they knew as 'Bee Bee.' Following a question from the court, Lannom qualified his identification with the statement 'unless there is someone I can't see.' Wright's identification was unqualified.
 
 
 99
 In Simmons, supra, the petitioner challenged a pretrial photographic identification procedure in which the witnesses were shown only a few snapshots of him, a co-defendant and others. The Court recognized both the dangers of misidentification in showing witnesses only a small number of photographs and the effective and widespread use of photographic identification procedures used in criminal law enforcement. Striking a balance between the requirements of due process and the public interest in the prompt investigation of unsolved crimes, the Court refused to prohibit the use of initial photographic identification as a matter of constitutional right. Instead, the Court held
 
 
 100
 'that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside (as a denial of due process of law) only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.' Simmons, 390 U.S. at 384, 88 S.Ct. at 971.
 
 
 101
 This rule is an application of the holding with respect to one-man lineups in Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1947). A claim that an identification procedure is impermissibly suggestive is to 'be evaluated in light of the totality of (the) surrounding circumstances.' Simmons, 390 U.S. at 383, 88 S.Ct. at 970.
 
 
 102
 The Simmons Court suggested two standards by which the permissibility of pretrial photographic identification should be judged. The first is whether the use of photographic identification was necessary in the particular case. Baxter argues that showing Wright and Lannom a single photograph was unnecessary because they had previously viewed, on one occasion, over one hundred photos. However, such an argument applies to the evaluation of the circumstances surrounding the actual identification, not to the question of whether a photographic identification procedure was necessary at all.
 
 
 103
 Most of the courts which have considered the necessity issue have focused on the question of whehter the photographic identification was made before or after the arrest of the suspect. If the suspect is not already in custody, the courts have readily found a necessity for the use of photographic identification. Simmons, supra. See also, United States v. Bennett, 445 F.2d 638 (9th Cir. 1971); United States v. Cox, 428 F.2d 683 (7th Cir. 1970).
 
 
 104
 Although Baxter does not raise the point, he was in custody prior to the time Wright and Lannom were shown the single photograph of him. This court has expressly held that a single photograph identification procedure was unnecessary where the defendant was already in custody. United States v. Fowler, 439 F.2d 133 (9th Cir. 1971). However, Fowler expressly distinguished cases such as Baxter's in which the witness 'did not testify as to his pre-trial identification and where the facts amply demonstrated an independent basis for the in-court identification.' 439 F.2d at 134. Thus, the per se exclusionary rule adopted in Fowler as to testimony concerning a pretrial identification does not apply here. See also, Kirby v. Illinois, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), in which the per se exclusionary rule was rejected as to testimony of a pretrial identification in which the defendants were the only two suspects in the room.
 
 
 105
 Whether the defendant is in custody is only one part of the necessity standard. In Simmons the Supreme Court also found necessity in the law enforcement officials' need to quickly determine whether they were on the right track. 390 U.S. at 385, 88 S.Ct. 967. See also, United States v. Cox, 428 F.2d 683, 686 (7th Cir. 1970). This reasoning applies to the present case. If Baxter was not the right man, immediate action to locate the real suspect was necessary.
 
 
 106
 This conclusion does not give law enforcement officials complete freedom to use single hpotograph identification procedures in every case. First, such procedures would not be necessary where a suspect had already been sufficiently identified by another witness from a larger group of pictures or where substantial evidence without the identification points to that suspect as the criminal. Second, and more important, 'necessity is only one factor in the total inquiry.' United States v. Conway, 415 F.2d 158, 163 (3rd Cir. 1969).
 
 
 107
 The other factor to be evaluated is the circumstances surrounding the identification. Simmons, 390 U.S. at 385, 88 S.Ct. 967. The issue is whether there was a very substantial likelihood of irreparable misidentification. Four specific indicators have been identified, three of which apply to this case. See Parker v. Swenson, 332 F.Supp. 1225 (E.D.Mo. 1971) for a summary of the four indicators identified by other courts and used in that case.
 
 
 108
 The first of those indicators which applies to this case is the length of time and the conditions in which the witness observed the defendant. Each meeting between either Wright or Lannom took place in a well-lighted place and the meetings each lasted for at least several minutes. The record does not indicate that Baxter ever wore dark glasses or any disguise. Each witness met Baxter three times. They had an excellent opportunity to observe him. Other courts have found the chance for misidentification minimal even though there was just one meeting for a short period of time. See, e.g., Simmons, supra (five minutes during a bank robbery); United States v. Black, 456 F.2d 1103 (9th Cir. 1972) (bank robbery); United States v. Long, 449 F.2d 288 (8th Cir. 1971) (bank robbery). Compare Mason v. United States, 134 U.S.App.D.C. 280, 414 F.2d 1176 (1969) (no grounds in the record to argue that the witness observed the defendant with any care). The meetings in this case gave the witnesses substantial opportunity for observation because of the nature of the transaction, and at each encounter subsequent to the initial meeting the witnesses recognized Baxter. There was little chance for misidentification.
 
 
 109
 The second indicator is the conduct of law enforcement officials. The likelihood of misidentification increases when they act in such a manner as to focus attention on a single suspect. Baxter contends that the use of a single photograph is enough to show improper conduct by the federal agents in this case. Despite the questionable nature of such a procedure, we agree with the conclusion of several courts that the use of a single photograph identification procedure does not necessarily interject prejudice. United States v. Kilgore, 418 F.2d 225 (9th Cir. 1969); Cox, supra. This is not a case in which the only photograph the witnesses saw was one of the defendant. Compare United States v. Fowler, 439 F.2d 133 (9th Cir. 1971). They were shown hundreds of photographs both before and after viewing the picture of Baxter. Also, there is no evidence in the record in this case tending to show that the federal agents in any way prompted Wright or Lannom to identify the photograph of Baxter.
 
 
 110
 The third indicator is the 'presence of other witnesses at the time of the . . . (actual) . . . identification and the possible prejudicial influence of one witness' opinion on another's recollection.' Parker, 332 F.Supp. at 1231. Baxter contends that Wright would be forced to identify the photograph after Lannom had done so because they were partners in crime. Although Lannom was present when Wright identified the photograph as that of Baxter, Wright was not present when Lannom identified it and there is no evidence that Lannom spoke to Wright prior to the latter's identification. A very substantial likelihood of irreparable misidentification is not shown by these facts.
 
 
 111
 Baxter's other contentions go to the weight of the in-court identifications, not to their admissibility. Thus, we are not persuaded by his arguments based upon the previous felonies of Wright and Lannom and on Wright's testimony that the person he met in Tijuana had vision problems, while Baxter apparently had none. Questions as to the weight of evidence are properly decided by the jury.
 
 
 112
 Mason v. United States, 134 U.S.App.D.C. 280, 414 F.2d 1176 (1969) is cited by Baxter as showing a substantial likelihood of misidentification where there is strong psychological pressure to make an identification. In that case the witness was a young woman who had been a bank teller only a few months. Her failure to check the defendant's identification when he made a withdrawal was a violation of her duties. However, Mason is distinguishable from the present case. Lannom and Wright had already identified over twenty photographs of other defendants prior to their identification of Baxter's picture. It is doubtful that the fact that they were fugitives and might have had their charges dropped by cooperating with the federal agents would coerce them into identifying one more suspect. Also, Lannom was told that the chances that he would be granted immunity were almost nil.
 
 
 113
 Finally, Baxter makes no argument that the in-court identifications were in any way influenced by the single photograph identification procedure. On the contrary, the witnesses had a more than adequate independent basis for making the in-court identifications. Davis v. United States, 425 F.2d 673 (9th Cir. 1970); United States v. Gill, 455 F.2d 1094 (5th Cir. 1972).
 
 
 114
 We conclude that Baxter has failed to show that the photograph-identification procedure used in identifying him was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.
 
 
 115
 VII. Failure of Government to Turn over to Defendants Substantive and Impeaching Evidence Favorable to Them
 
 
 116
 Defendants argue that the Government's failure to supply them with the black valise Richard Wright brought across the border on December 16, 1968, constitutes a suppression of evidence denying them due process of law. Prior to the trial, defendants filed motions for an order directing the Government to advise their attorneys of any evidence favorable to the defendants. The trial court granted the motion. After the trial commenced, but two weeks before its conclusion, defendants learned of the Government's possession of the valise, which contained certain documents used by the Hernandez organization.
 
 
 117
 Alleging that this late disclosure was prejudicial to the preparation of the defense, defendants moved for a mistrial. The trial court denied the motion. Defendants argue that the contents of the valise were important to the defendants' case-in-chief and to the impeachment of Government witnesses Wright and Lannom.
 
 
 118
 Defendant Baxter makes a similar argument with respect to the Government's delay in supplying him with the name of a witness, Joseph Silva, who might have given testimony favorable to Baxter on the identification issue. Baxter was notified of Silva's existence and of the fact that he might be able to supply evidence favorable to Baxter shortly before the trial concluded. Baxter subsequently called Silva as his witness.
 
 
 119
 Baxter also alleges error because of the trial court's refusal to order the Government to supply him with prior statements made by Silva to federal agents. Finally, Baxter asserts that the trial court incorrectly denied his motion to suppress the testimony of Charles Walters concerning an apartment Baxter rented in Los Angeles. One of the trial court's pretrial orders directed the Government to provide counsel for the defendants, at least twenty-four hours prior to the trial, with the grand jury testimony of any witness the Government intended to call at the trial. On August 21, 1969, three days after the trial began, Baxter's attorney stated that he had just received Walters' grand jury testimony. Walters was called as a Government witness on August 25.
 
 
 120
 There is no constitutional requirement that the prosecution make a complete accounting to the defense of all evidence in its possession. Moore v. Illinois, 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972). However, 'the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.' Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963). To establish a violation of due process, the defendant must show (1) a request by the defendant for favorable evidence possessed by the prosecutor, (2) suppression of evidence by the prosecutor, (3) that the evidence suppressed is favorable to the defendant and (4) that the evidence is material. Moore, supra.
 
 
 121
 Defendants' general pretrial requests for favorable evidence satisfy the first of these requirements. See Lee v. United States, 388 F.2d 737 (9th Cir. 1968).
 
 
 122
 Concerning the second requirement, pertaining to prosecutorial suppression, it is established that there was no complete suppression of the evidence referred to above. But there were delays in turning over the evidence to defendants. Whether the delay in turning over requested favorable evidence amounts to an unconstitutional suppression of it depends upon whether the delay in disclosure substantially prejudiced defendants in the preparation of their defense. See United States v. Trainor, 423 F.2d 263 (1st Cir. 1970). See also, United States v. Goodman, 457 F.2d 68, 72 (9th Cir. 1972).
 
 
 123
 Here defendants learned of the existence of the valise and examined its contents at least two weeks prior to the conclusion of the trial. We think this provided defendants with sufficient time to examine, evaluate and introduce any evidence defendants believed would help their case. Similarly, four days was a sufficient time for Baxter's attorney to examine Walters' grand jury testimony and prepare to cross-examine him. There is no constitutional requirement that the disclosure be made prior to trial. Thomas v. United States, 343 F.2d 49 (9th Cir. 1965); United States v. Cole, 453 F.2d 902 (8th Cir. 1972); Trainor, supra.
 
 
 124
 Defendants do not argue, with respect to these two claims, that this evidence supplied clues to other evidence which could only have been obtained by further extensive investigation. Continuances based on the newly-discovered evidence were not requested. Defendants have failed to show that the time of disclosure was prejudicial to them and, therefore, have failed to prove unconstitutional suppression by the Government.
 
 
 125
 The Government apparently did fail to comply with the pretrial order to provide defendants with a transcript of Walters' grand jury testimony at least twenty-four hours prior to the trial. However, the sanctions to be imposed, if any, because of a failure to comply with a pretrial discovery order rest within the sound discretion of the trial court. See Hansen v. United States, 393 F.2d 763, 770 (8th Cir. 1968). Baxter was not prejudiced by the Government's delay, and we find no abuse of discretion in permitting Walters to testify.
 
 
 126
 Baxter's claim with respect to the delay in notifying him of the existence of Joseph Silva presents a closer question. He argues that 'prior warning as to this witness could have resulted in extensive information and a much more favorable evidence situation for' him. However, in Thomas v. United States, 343 F.2d 49, 54-55 (9th Cir. 1965), this court in part based its decision that there was no suppression on the fact that the defendant received the allegedly suppressed information from the Government in time to call the witness who admitted he had stolen the guns in question. Baxter did call Silva as a witness. Thus, the time of disclosure was not prejudicial to him and his claim of suppression is without merit.
 
 
 127
 Defendants' appeals on these points also fail because they make no showing that the allegedly suppressed evidence is favorable to them and material to the case-- these being the last two of the four requirements referred to above. To meet these third and fourth requirements they must show that relevant evidence tending to exculpate them has been suppressed. Barbee v. Warden, Maryland Penitentiary, 331 F.2d 842 (4th Cir. 1964). Baxter not only fails to show such evidence, he fails even to indicate what Silva might have disclosed, relevant or not.
 
 
 128
 Defendants argue that the valise contained 'certain materials that the defense felt were evidence favorable to the defense.' The usefulness of other items, they assert, will never be known because of the time of disclosure. However, they fail even to suggest any way in which these items might have influenced the case. Thus, defendants have not shown a denial of due process. United States v. Hills, 455 F.2d 504 (9th Cir. 1972); United States v. White, 450 F.2d 264 (5th Cir. 1971); United States v. Teague, 445 F.2d 114 (7th Cir. 1971).
 
 
 129
 Finally, the Government was under no obligation to supply Baxter with Silva's prior statements. Silva was apparently not a grand jury witness, and, since he was a defense witness at the trial, there is no provision of the pretrial order which required the Government to produce his pretrial statements. Nor is there any such requirement in Rule 16, Fed.R.Crim.P. or 18 U.S.C. 3500.
 
 VIII. Miscellaneous Issues
 
 130
 1. After the jury began its deliberations, they requested to have read back to them the testimony of Government witnesses Lannom and Wright concerning the identification of 'Bee Bee' as Baxter. The jury did not request that any testimony by a defense witness be read back. The trial court denied this request. The court's reasons for denying the request are set out in the margin.[19] Timely objection was made to this ruling. Defendant Baxter contends that the refusal to reread his testimony constitutes reversible error.
 
 
 131
 Such a trial ruling is not to be disturbed unless, under the circumstances, it amounts to an abuse of discretion. United States v. De Palma, 414 F.2d 394, 396 (9th Cir. 1969). In our view the reasons given by the trial court for refusing the jury's request were sound and were motivated primarily by the desire to protect the defendants from possible prejudice. We will not speculate whether the request would have been granted if Baxter's trial had been severed. The reasons given by the court would have been equally applicable had Baxter alone been on trial. There was no abuse of discretion.
 
 
 132
 2. Defendants argue that the trial court erred in not requiring the Government to turn over to defendants, for review, a cassette tape of a conversation between Lawrence (Larry) Katz, Federal Bureau of Narcotics Agent, Robert Hernandez, Lannom and Wright, which occurred in the Hernandez home. The tape was in the custody of Customs personnel in Los Angeles. The district court ordered the tape to be brought to San Diego and played. Because of the Government's insistent opposition, the court heard the tape in camera. The court denied defendants the right to hear the tape, asserting that it was partly unintelligible and that there was nothing in it favorable to any of the defendants. The tape was sealed and marked as Government Exhibit No. 342.
 
 
 133
 Defendants do not ask this court to listen to the 'Katz' tape to determine whether the district court made a correct ruling. Instead, defendants assert an absolute right to listen to the tape themselves. Presumably, then, defendants would not be satisfied if we reviewed the tape and we have not done so.
 
 
 134
 Defendants rely upon United States v. Alderisio, 424 F.2d 20 (10th Cir. 1970). But Alderisio was a sequel to Alderman v. United States, 394 U.S. 165, 184, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), which pertained to the transcripts of a defendant's own conversations, and of those which took place on his premises. The tape here in question involved none of the defendants, nor was it recorded on the premises of any defendant. It involved only a recital of past conversations between Government witnesses, a co-conspirator who was not tried, and Government agents.
 
 
 135
 As to such a tape an in camera review by the trial judge is adequate absent a special showtng of probable prejudice. See Scales v. United States,367 U.S. 203, 258, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961). In our opinion the trial court did not abuse its discretion with regard to this protective order entered pursuant to Rule 16(e), Fed.R.Crim.P.
 
 
 136
 3. Defendants argue that the trial court erred in refusing to require the Government to produce, for trial testimony, two individuals who were under the protection of the United States outside of the State of California. These individuals are Mrs. Donald Lannom, wife of a principal Government witness, and Miss Juliette Franco, a friend of Richard Wright, another principal Government witness.
 
 
 137
 The trial commenced on August 18, 1969. Late on the afternoon of September 8, 1969, just three days before the Government commenced its closing arguments, defendants tendered to the United States Marshal subpoenas for Mrs. Lannom and Miss Franco. The Marshal would not accept the subpoenas because no addresses for these persons were supplied. Since the Government had these individuals under protection defendants then contacted the Government's trial attorney and asked that the two women be made available for trial testimony.
 
 
 138
 The Government trial attorney asked for a trial court ruling on this request. It was the Government's position that defendants had made no showing that the testimony of these persons would be helpful, that to produce them for testimony would delay the trial, and that it would probably result in mental strain and anguish for the proposed witnesses. Counsel for defendants asserted that Mrs. Lannom might be able to give testimony relevant to Lannom's financial status, including income and expenses, and to what Lannom did with the large sums of money he assertedly received. Counsel added, 'I have to admit it is a fishing expedition to this extent.' Counsel for defendants suggested that Miss Franco might be able to give testimony concerning large amounts of money Lannom and Wright had, and this would bear upon their motive, bias or interest.
 
 
 139
 The trial court denied the request that the Government be required to produce these two individuals for testimony. It did so primarily upon the ground that the request came too late, indicating that had the request been made two and a half weeks or so previously, it might have been granted.
 
 
 140
 The record contains no explanation for defendants' delay in seeking this testimony other than the suggestion by one defense attorney that it was defense strategy not to give the Government too much advance notice 'as to permit prolonged coaching of the witnesses.' The trial court could properly conclude that this was not an acceptable explanation for the delay. Taken in conjunction with defendants' inability to make more than a speculative showing that the testimony was needed, we think it provided ample grounds for denial of the request. We therefore conclude that the trial court did not abuse its discretion. See United States v. Grooms, 454 F.2d 1308, 1311 (7th Cir. 1972); United States v. Becker, 444 F.2d 510 (4th Cir. 1971); Neufield v. United States, 73 App.D.C. 174, 118 F.2d 375, 385 (1941).
 
 
 141
 4. Defendants contend that while Wright's hearsay testimony concerning conversations he had with Helen Hernandez falls under the co-conspirator exception to the hearsay rule, it nevertheless deprived defendants of their rights under the Confrontation Clause of the Sixth Amendment. Helen Hernandez was unavailable for cross-examination.
 
 
 142
 Wright's testimony concerning his conversations with Helen Hernandezwas, indeed, admissible under the co-conspirator exception to the hearsay rule, as applied in federal courts. See Dutton v. Evans, 400 U.S. 74, 81, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970). However, the applicability of this exception to the hearsay rule does not necessarily evidence compliance with the Confrontation Clause. United States v. Adams, 446 F.2d 681, 683 (9th Cir. 1971). In determining whether that clause is violated,
 
 
 143
 'the relevant factual inquiry is whether, under the circumstances, the unavailability of the declarant for cross-examination deprived the jury of a satisfactory basis for evaluating the truth of the extrajudicial declaration.' Adams, 446 F.2d at 683.
 
 
 144
 In Dutton v. Evans, supra, the Supreme Court discussed the factors to be considered in making this factual inquiry. One factor is the declarant's knowledge of the identities and roles of the other co-conspirators. Helen Hernandez was one of the two leaders of the conspiracy, thus she was in a position to know all of its members and the facts on which her statements were based. Another factor is whether the out-of-court statements might be founded on faulty recollection. Wright's testimony concerned statements made by Helen Hernandez to him during the regular operation of the conspiracy, thus the chance that she could not remember the facts on which her statements were based is remote. Similarly, there is no suggestion that she made the statements under circumstances indicating that she was lying to Wright. On the contrary, he then occupied a position of confidence in the conspiracy. Since he kept all the records of the transactions, it was necessary for Helen Hernandez to be truthful with him. There is little possibility that, had she been available for cross-examination, the defendants could have shown that her statements were unreliable. Under the circumstances, we hold that the Confrontation Clause was not violated.[20]
 
 
 145
 5. Defendants assert that the trial court erred in admitting into evidence, over objection, Government's Exhibit 1, which consisted of ten and eight-tenths pounds of heroin seized from 'Emma' at the Mexican border on December 16, 1968. This exhibit was inadmissible on the conspiracy count, defendants urge, because Wright and Lannom, who were intimately connected with this shipment, had left the conspiracy by December 1, 1968, and were thereafter working with Government agents. The exhibit was not admissible on the substantive count, defendants argue, because Wright's and Lannom's connection with the shipment gave rise to an entrapment defense.
 
 
 146
 With regard to the conspiracy count, defendants acknowledge that the federal rule which excludes post-conspiracy declarations from the co-conspirator exception to the hearsay rule, has no application to post-conspiracy acts, since hearsay is not involved. See Lutwak v. United States, 344 U.S. 604, 617, 73 S.Ct. 481, 97 L.Ed. 593 (1953). But defendants argue that acts in which Lannom and Wright participated after they left the conspiracy are 'irrelevant to the conspiracy.'
 
 
 147
 The heroin comprising Government Exhibit 1 was smuggled into the United States by 'Emma' upon the direction of Helen Hernandez. Whatever Lannom and Wright had to do with this act of smuggling tended to demonstrate, at the very least, the positions of trust and confidence they occupied in the Hernandez organization prior to the disclosure that they had left the conspiracy. This, in turn, lends credence to their testimony concerning the way the conspiracy operated. In our opinion, the exhibit in question constituted relevant and admissible evidence.
 
 
 148
 6. Insofar as the substantive count is concerned, defendants are not in a position to interpose an entrapment defense, because they have not admitted the commission of the acts constituting the substantive offense.[21] Nor did defendants assert such a defense in the trial court. We find no merit to their arguments addressed to the admission of Government Exhibit 1.
 
 
 149
 The judgments of conviction in these Group I appeals are affirmed.
 
 
 
 *
 The Honorable Robert H. Schnacke, United States District Judge for the Northern District of California, sitting by designation
 
 
 [1]
 Congress repealed 18 U.S.C. 1403 and 21 U.S.C. 173 and 174 on October 27, 1970, effective May 1, 1971, saving prosecutions commenced prior to the effective date. 84 Stat. 1291-1292, 1294, 1295 (1970). The superseding statutes are 21 U.S.C. 952(a), 960 and 963 (1970)
 
 
 [2]
 The appeals of five defendants tried in Group II have been consolidated for disposition, but two of those five appeals (Gerald Wilson Frunzi and Martha Montellano Catarino) have since been dismissed. The opinion disposing of the Group II appeals, filed today, is reported in United States v. Murray, et al., 492 F.2d 178 (9th Cir. 1973). The appeals of five defendants tried in Group III have been consolidated for disposition in an opinion, filed today, reported in United States v. Valdivia, et al., 492 F.2d 199 (9th Cir. 1973)
 Another two-count indictment involving alleged similar narcotics transactions led to the conviction of Lloyd Mickens and Tommy Wagner, both of whom have appealed. An opinion disposing of their appeals (Group IV), filed today, is reported in United States v. Mickens, et al., 492 F.2d 211 (9th Cir. 1973). All of the appeals in Groups I through IV were argued before the same panel of this court on the same day. They will sometimes be collectively referred to herein as the Hernande cases.
 A related narcotics conspiracy case was before this court in United States v. Estrada, et al., 441 F.2d 873 (1971).
 
 
 [3]
 This summary of the facts is drawn mainly from the Government's beief
 
 
 [4]
 During this period the Hernandez organization used a 'subtract from ten' code for the relaying of such information. Under this code, the number to be protected was converted into a different number by subtracting each individual digit from ten and using the remainder as the code number
 
 
 [5]
 An example of how Wright conveyed this information is found in exhibit 279, which is a tape recording of a conversation between Wright and Cohn on December 7, 1968. In this conversation Wright informed Cohn that customer 'Skeeter' was to receive six 'boys' (six ounces of heroin) and four 'girls' (four ounces of cocaine). The customer's coded telephone number was first converted into the 'time of days' code, successor to the 'subtract from ten' code, wherein 1 became T, 2 became I, etc. This produced the letters D O A I T D I for the customer's telephone number, and this information was given to Cohn as 'David, Orville, Arnold, Irene, Tom, David and Irene.'
 
 
 [6]
 One retail customer, known as 'Rosie,' whose volume was over three times that of any other customer, paid the Hernandezes three hundred dollars an ounce for heroin
 
 
 [7]
 There are, of course, factual distinctions between Blumenthal and the case now before us. But those distinctions do not, in our opinion, undermine the application in this case of the following rationale of Blumenthal:
 'For it is most often true, especially in broad schemes calling for the aid of many persons, that after discovery of enough to show clearly the essence of the scheme and the identity of a number participating, the identity and the fact of participation of others remain undiscovered and undiscoverable. Secrecy and concealment are essential features of successful conspiracy. The more completely they are achieved, the more successful the crime. Hence the law rightly gives room for allowing the conviction of those discovered upon showing sufficiently the essential nature of the plan and their connections with it, without requiring evidence of knowledge of all its details or of the participation of others. Otherwise the difficulties, not only of discovery, but of certainty in proof and of correlating proof with pleading would become insuperable, and conspirators would go free by their very ingenuity.' 332 U.S. at 556-557, 68 S.Ct. at 256.
 
 
 [8]
 We do not regard this statement as contrary to the following dicta in Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946):
 'Thieves who dispose of their loot to a single receiver-- a single 'fence'-- do not by that fact alone become confederates: they may, but it takes more than knowledge that he is a 'fence' to make them such.' 328 U.S. at 755, 66 S.Ct. at 1243, quoting United States v. Lekacos, 151 F.2d 170, 173 (2d Cir. 1945). '. . . the pattern was 'that of several spokes meeting in a common center,' though, we may add, without the rim of the wheel to enclose the spokes.' 328 U.S. at 755, 66 S.Ct. at 1243.
 If each of the narcotics retailers who are defendants here knew, or had reason to know, that other retailers were involved in the project, and had reason to believe that his own benefits derived from the operation were probably dependent upon the success of the entire venture, the retailers are obviously involved in the general conspiracy to an extent far beyond that depicted in the Kotteakos language quoted above.
 On the same grounds we distinguish United States v. Griffin, 464 F.2d 1352 (9th Cir. 1972).
 
 
 [9]
 United States v. Estrada, 441 F.2d 873 (9th Cir. 1971), heavily relied upon by the Government, is not to the contrary. That case involved this same Hernandez narcotics operation. The court found, as to the defendants in that case, that a single conspiracy had been made out. However, the evidence detailed by the court at 441 F.2d 879 shows that each of the defendant 'spokes' in Estrada was linked, not only to the core group, but to each other. Of course this linkage may be proved circumstantially. See Friedman, 445 F.2d at 1080; Daily, 282 F.2d at 820-821
 The Government cites a number of Second Circuit decisions which might be regarded as supporting the proposition that an individual defendant with only as much knowledge as Quinn, in Daily, may be found to be a member of a single, large-scale conspiracy. See United States v. Bentvena, 319 F.2d 916 (2d Cir. 1963); United States v. Cianchetti, 315 F.2d 584 (2d Cir. 1963); United States v. Agueci, 310 F.2d 817 (2d Cir. 1962); United States v. Stromberg, 268 F.2d 256 (2d Cir. 1959) and United States v. Bruno, 105 F.2d 921 (2d Cir. 1939), rev'd on other grounds, 308 U.S. 287, 60 S.Ct. 198, 84 L.Ed. 257 (1939).
 Cianchetti and Agueci are inapposite on this question. In Cianchetti, all the conspirators were shown to know the extent of the scheme and the existence or identity of most or all of the other conspirators. The same is true of Agueci except as to Matthew Palmieri. As to Palmieri, the court held the knowledge issue moot because his conviction was upheld under the 'concurrent sentence' rule.
 Stromberg, at least as to defendants Seto and DeSaverio, is in point. The only evidence of their knowledge of the whole scheme and of the other conspirators was the testimony of a witness who had seen them meet with one of the distributors. The court's discussion of the facts of the case implies that the distributor met with each retailer separately. 268 F.2d at 268. If the meetings were in fact separate, then the connection of these two defendants to a single, large-scale conspiracy rested on the court's holding that from evidence of a core group
 'buying, importing, and distributing narcotics for sale in large quantities and successive transactions . . . it might rationally be inferred that one joining such a conspiracy knew that it had a scope and that, for its successful operation, it required a wide-spread organization, more comprehensive than may have been disclosed by any contact or transaction of which he had knowledge through his actual personal participation.'
 268 F.2d at 264. Quinn's acts in Daily are distinguishable from the transactions of Seto and DeSaverio in Stromberg. Seto and DeSaverio made several purchases over an extended period of time. Such transactions are much more likely to provide a sufficient basis for finding a reason to know of a large-scale operation then Quinn's small, relatively isolated purchases.
 In Bentvena, Sciremammano's conviction was upheld as part of an over-all conspiracy even though the Government's only proof was that he received packages of narcotics on three separate occasions from other conspirators. The court found this to be sufficient evidence from which the jury could reasonably infer that he was aware of a larger scheme. In Bruno, lack of knowledge was not considered fatal to convictions based on an indictment charging a single conspiracy. However, there is no discussion in Bruno as to the size of the operation or as to the quantity and frequency of the transactions of the individual defendants. To the extent that Bruno and Bentvena would mandate a holding that narcotics retailers, if any, who purchased from the Hernandez organization without knowledge that other retailers were a part of the operation, and without reasonable cause to believe this to be the case, are part of a single, over-all conspiracy, they contravene Ninth Circuit precedent referred to above, and go far beyond the Supreme Court's decision in Blumenthal, supra.
 
 
 [10]
 Section II of this opinion was prepared by Judge Choy
 
 
 [11]
 Wright was custodian of the records at the time he brought them to the border. His testimony is sufficient authentication. Cf. Arena v. United States, 226 F.2d 227, 234 (9th Cir. 1955) (criminal records authenticated by person other than custodian or entrant)
 
 
 [12]
 None of the defendants have standing to challenge the seizure of records from the Hernandezes because they are not 'aggrieved persons' under Rule 41(e), Fed.R.Crim.P.; Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L,. ed.2d 176 (1969)
 
 
 [13]
 Assuming arguendo that there was a denial of Sixth Amendment rights, we are persuaded that it was harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Aside from entries made by Mrs. Hernandez, the notebooks contained entries on all customers made by Wright. This is a sufficient alternative source of the same incriminating information to render the error constitutionally harmless
 
 
 [14]
 The first sentence of 47 U.S.C. 605, as amended June 19, 1968, reads as follows:
 'Except as authorized by chapter 119, Title 18, no person receiving, assisting in receiving, transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception, (1) to any person other than the addressee, his agent, or attorney, (2) to a person employed or authorized to forward such communication to its destination, (3) to proper accounting or distributing officers of the various communicating centers over which the communication may be passed, (4) to the master of a ship under whom he is serving, (5) in response to a subpoena issued by a court of competent jurisdiction, or (6) on demand of other lawful authority.
 
 
 [15]
 While Bubis was decided prior to the 1968 amendment of section 605, that amendment made no material change in the first sentence, insofar as the point under discussion is concerned
 In United States v. Covello, 410 F.2d 536, 541 (2d Cir. 1969), the Second Circuit seemed willing to assume 'for purposes of this case,' that the entire telephone company should be treated as one person for the purposes of the first part of section 605. This assumption is not available to defendants in the Ninth Circuit, in view of Bubis v. United States, 384 F.2d 643 (9th Cir. 1967). But even with this assumption in Covello, the Second Circuit held that there was no violation of the first sentence of section 605 because, in its view, toll records are not the kind of records contemplated by that section in forbidding the divulgence of the existence of any interstate or foreign communications. See also, United States v. Cerone, 452 F.2d 274, 289 (7th Cir. 1971). We need not decide that question.
 
 
 [16]
 This part of section 605, as amended, reads:
 'No person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person. No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto. No person having received any intercepted radio communication or having become acquainted with the contents, substance, purport, effect, or meaning of such communication (or any part thereof) knowing that such communication was intercepted, shall divulge or publish the existence, contents, substance, purport, effect, or meaning of such communication (or any part thereof) or use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto. This section shall not apply to the receiving, divulging, publishing, or utilizing the contents of any radio communication which is broadcast or transmitted by amateurs or others for the use of the general public, or which relates to ships in distress.
 
 
 [17]
 In Hanna v. United States, 404 F.2d 405, 408 (5th Cir. 1968), it was held that 'no sound distinction as to the applicability of section 605 can be drawn between wire and radio.' But while Hanna was decided after enactment of the 1968 amendment of section 605, it was a decision on rehearing in a case first decided by the Fifth Circuit prior to the 1968 amendment, reported in 393 F.2d 700, and reviewed a district court judgment entered on September 26, 1966, reported in 260 F.Supp. 430 (S.D.Fla.1966). Thus, the Hanna decision reported at 404 F.2d 405, does not deal with section 605 as amended
 
 
 [18]
 Section V of this opinion was prepared by Judge Schnacke
 
 
 [19]
 The court told the jury:
 'The reason for that is that, in addition to the physical problem in seeking out those portions of the record, it would give over-emphasis to that particular area of evidence, which is not the appropriate method of resolving cases of this kind. In order to overcome that, it would be necessary to read all of the evidence again in respect to those issues, and that would then lead into reading the entire record.
 'We have tried this case now for four weeks, and the reason we have twelve jurors, or one of the reasons, is that each reaches his own conclusion after discussion with the others, and it is hoped that out of that distillation process that the jury can seek the truth adequately.'
 
 
 [20]
 It may be noted that, in making this confrontation argument, defendants did not attempt a detailed analysis of Helen Hernandez' statements to which Wright testified, but observed only that they related to Wright's 'employment and other matters pertaining to this case.' Thus we are not in a position to determine how crucial the right of cross-examination of Helen Hernandez was to defendants. Compare the technique employed by the Supreme Court in Dutton v. Evans, 400 U.S. at 87-89, 91 S.Ct. 210
 
 
 [21]
 See United States v. Durden, 460 F.2d 318, 319 (9th Cir. 1972); United States v. Hendricks, 456 F.2d 167 (9th Cir. 1972); United States v. Gary, 447 F.2d 907, 909 (9th Cir. 1971); United States v. Rodriquez, 446 F.2d 859 (9th Cir. 1971)